[No. A126064. First Dist., Div. Five. Aug. 7, 2012.]

THE PEOPLE, Plaintiff and Appellant, v.
CARLOS ROBINSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I.B., C., II., III., and V.

**COUNSEL**

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Laurence K. Sullivan, Amy Haddix and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Appellant.

Robert Wayne Gehring, under appointment by the Court of Appeal, for Defendant and Appellant.

---

## OPINION

**SIMONS, J.**—Carlos Robinson (defendant) appeals from the judgment entered following a jury trial that resulted in his conviction of assault on a peace officer with an assault weapon, possession of heroin for sale, being a felon in possession of a firearm and ammunition, and participation in a criminal street gang. The jury found true sentencing enhancements associated with various counts. On appeal, defendant contends the trial court erred in denying his motion to suppress evidence discovered following a warrantless entry into a residence. On October 28, 2011, this court filed a decision concluding denial of the suppression motion was proper under the independent source doctrine because, among other things, the police did not violate the Fourth Amendment to the United States Constitution by testing a key in the front door lock to the residence; therefore, the information gained by testing the key was properly considered in applying the doctrine. The Supreme Court granted defendant's petition for review and transferred the matter to this court with directions to reconsider the cause in light of *United States v. Jones* (2012) 565 U.S. ___ [181 L.Ed.2d 911, 132 S.Ct. 945] (*Jones*). (*People v. Robinson*, review granted Feb. 15, 2012, S198522); see Cal. Rules of Court, rule 8.528(d).) We conclude in the published portion of this decision that the *Jones* decision does not alter the result in the present case because, even assuming testing the key in the lock was a warrantless search, it was lawful under an exception to the warrant requirement for minimally intrusive searches.

In our October 2011 decision, we also rejected defendant's contentions the trial court erred in failing to instruct the jury on the offense of brandishing a firearm in the presence of a peace officer as a lesser included offense to the assault charge, the gang enhancement findings are not supported by substantial evidence, and the trial court committed error under Penal Code section 654.[1] In this decision, we again reject defendant's contentions relating to the absence of an instruction on the brandishing offense and the gang enhancement findings. However, based on the Supreme Court's recent decision in *People v. Mesa* (2012) 54 Cal.4th 191 [142 Cal.Rptr.3d 2, 277 P.3d 743] (*Mesa*), we conclude the trial court committed error under section 654.

Finally, in our October 2011 decision we addressed the People's cross-appeal, which contended the trial court erred in staying an enhancement to

---

[1] All undesignated section references are to the Penal Code.

the assault charge for commission of a violent felony for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).[2] We concluded in that portion of our published decision the Supreme Court's decision in *People v. Rodriguez* (2009) 47 Cal.4th 501 [98 Cal.Rptr.3d 108, 213 P.3d 647] (*Rodriguez*) did not obligate the trial court to stay the enhancement because section 12022.53, subdivision (e)(2) expressly authorized imposition of enhancements under both section 186.22(b)(1)(C) and section 12022.53, subdivision (b).[3] In this decision, we reach the same conclusion and again publish that portion of the decision.

We remand for resentencing and otherwise affirm.

## PROCEDURAL BACKGROUND

An indictment filed on May 20, 2005, in Contra Costa County Superior Court charged defendant in counts 1 and 2 with assault on a peace officer with an assault weapon (§ 245, subd. (d)(3)), with enhancements for personal use of a firearm (§ 12022.53(b)), carrying a firearm in the commission of a street gang crime (§ 12021.5, subd. (a)), carrying a firearm with a detachable magazine in the commission of a street gang crime (§ 12021.5, subd. (b)), and commission of a violent felony for the benefit of a criminal street gang (§ 186.22(b)(1)(C)). Count 3 charged defendant with possession of heroin for sale (Health & Saf. Code, § 11351), with enhancements for being armed with a firearm (§ 12022, subd. (c)) and commission of a crime for the benefit of a criminal street gang (§ 186.22(b)(1)), and a probation ineligibility allegation for possession of more than 14.25 grams of heroin (§ 1203.07, subd. (a)(1)). Count 4 charged defendant with being a felon in possession of a firearm (§ 12021, subd. (a)(1)), with an enhancement for commission of a crime for the benefit of a criminal street gang (§ 186.22(b)(1)). Count 5 charged defendant with being a felon in possession of ammunition (§ 12316, subd. (b)(1)), and count 7 charged him with participation in a criminal street gang (§ 186.22, subd. (a)). The indictment also included allegations relating to defendant's prior convictions.[4]

In June 2009, a jury found defendant not guilty on count 2, and guilty on counts 1, 3, 4, 5, and 7. The jury found true the enhancements alleged as to counts 1, 3, and 4.

In August 2009, the trial court sentenced defendant to a state prison term of 30 years, including consecutive 10-year terms for both the section 12022.53(b)

---

[2] All references to section 186.22, subdivision (b) will be styled as section 186.22(b).

[3] All references to section 12022.53, subdivision (b) will be styled as section 12022.53(b); section 12022.53, subdivision (e) will be styled as section 12022.53(e).

[4] The indictment also included charges against two codefendants, who are not parties to this appeal.

and the section 186.22(b)(1)(C) enhancements to count 1. Subsequently, the trial court resentenced defendant and imposed a new sentence of 29 years four months in state prison, including 10 years for the section 12022.53(b) enhancement; the court stayed the count 1 section 186.22(b)(1)(C) gang enhancement.

Defendant appealed and the People filed a cross-appeal as to the trial court's order staying the count 1 section 186.22(b)(1)(C) enhancement to count 1. In our October 2011 decision, this court rejected defendant's contentions, agreed with the People's contention in the cross-appeal, and remanded for resentencing. The Supreme Court granted defendant's petition for review and transferred the matter to this court with directions to reconsider the cause in light of *Jones*. The parties submitted supplemental briefs under rule 8.200(b) of the California Rules of Court and also submitted supplemental letter briefs addressing a question posed by this court.

## FACTUAL BACKGROUND

Around 10:00 a.m. on February 17, 2004, then Richmond Police Officer Amy Bublak was responding to a report of a burglary when she heard 13 to 15 gunshots coming from the 300 block of Sanford Avenue (Sanford). She drove her patrol car down Filbert Street (Filbert), in the direction of the gunfire, and observed a silver Volkswagen on Sanford moving toward her. As the Volkswagen entered the intersection at Sanford and Filbert, Bublak moved her patrol car forward, causing the Volkswagen to stop with its passenger door in front of the patrol car's bumper. The passenger in the Volkswagen leaned out of the window and aimed a rifle at Bublak for about 10 seconds. At trial, Bublak identified defendant as the person who pointed the rifle at her.

The Volkswagen drove off and Bublak pursued it. The Volkswagen stopped at 221 Sanford, and the driver and defendant exited the car and fled on foot. Defendant turned, briefly pointed the rifle at Bublak a second time, and then continued fleeing.

Multiple officers responded to the area to assist Bublak. Expended cartridges were recovered from in front of 319/321, 324, and 330 Sanford.[5] A lot with two residences is located at 319/321 Sanford; 321 Sanford is behind 319 Sanford. Bublak recovered a set of keys from the ignition of the abandoned Volkswagen, and one of the keys unlocked the front door of 321 Sanford. Without obtaining a warrant, police officers entered 321 Sanford and found

---

[5] The crime scene investigator who testified at trial apparently misspoke and referred to 319/321 Sanford as 313/321 Sanford.

heroin, marijuana, drug packaging materials, and ammunition. The police also found photographs, and Bublak identified defendant in one of the photographs as the person who had pointed a rifle at her.

Two witnesses saw the shooting that preceded the incident involving Bublak. Christopher Barfield testified pursuant to a plea agreement that, on February 17, 2004, he was living at 412 Sanford. That day, he saw defendant arguing with others over a drug sale. Defendant ran to a house across the street and emerged shortly thereafter holding an assault rifle (a police officer testified that Barfield told him defendant retrieved the weapon from 321 Sanford).[6] Defendant fired at the men he was arguing with, and they returned fire with handguns. Defendant then fled up the street and encountered a police vehicle. He pointed the assault rifle at a female officer in the patrol car. Defendant then continued running on Sanford and met up with his brother, who was driving a Volkswagen.

The second witness to the shooting, Cal Harris, lived across the street from 319/321 Sanford. On February 17, 2004, he was standing at his front door when he saw a man shooting a gun directly across the street from his house. He could not identify the man. In a statement to the police, Harris said he saw the shooter go into 321 Sanford, apparently before the shooting occurred.[7] At trial, Harris testified the shooter entered a blue full-sized car and drove off. In his earlier statement to the police, Harris said the man ran down the street after the shooting.

Cynthia Peters, a confidential informant for the police, was at a construction jobsite in February 2004 when she heard gunfire. Defendant ran by her holding an assault rifle. Peters knew defendant because she had previously purchased heroin from him about 50 times. On one such occasion, she purchased drugs from him inside 321 Sanford.[8]

Inspector Shawn Pate of the Contra Costa County District Attorney's Office testified as an expert on Project Trojans, a criminal street gang based in a 13-block area of North Richmond. Its primary purpose is the sale of narcotics, including heroin. There are several Project Trojans gang subsets. The subsets have independent narcotics sales operations, and a member may not sell narcotics outside the geographic boundary of his or her subset. Members of a Project Trojans subset will attack outsiders who attempt to sell drugs in their territory. The Yard is a subset of Project Trojans involved primarily in heroin sales. The Yard's "focal point" is 330 Sanford.

---

[6] The information the police obtained from Barfield was not included in the search warrant affidavit.

[7] The search warrant affidavit did not state that Harris saw defendant enter 321 Sanford.

[8] This information was not included in the search warrant.

Pate opined that defendant and defendant's brother, Ronnie Thrower, were members of Project Trojans on February 17, 2004, based on the assumed facts, among others, that they ran a significant heroin sales operation from a house in the 300 block of Sanford and that photographs taken from 321 Sanford depicted defendant with persons flashing Project Trojans gang signs.

Pate also opined, based on Barfield's observations, that the shooting on February 17, 2004, involved a dispute between defendant and another person over the sale of narcotics. According to Pate, defendant's use of violence would benefit Project Trojans by maintaining order in the gang's narcotics sales operation. Defendant's act of pointing an assault rifle at Bublak would benefit the gang by holding her at bay, thereby allowing defendant and other members of the gang an opportunity to escape and hide or destroy evidence. Defendant's violent conduct would also benefit the gang by instilling fear in the community about cooperating with the police.

### Defense Case

Barfield's mother denied that Barfield lived in her home at 412 Sanford in February 2004 and denied that he was present there on the day of the shooting. Barfield's brother also testified that Barfield was not at 412 Sanford on February 17, 2004.

Defendant's mother testified that 321 Sanford was rented for her, but she discovered that her oldest son, Thrower, was selling heroin from the residence. She said defendant visited her at the 321 Sanford residence and kept clothes there, but he was not involved in Thrower's drug sales. She moved to Fresno and was not living at the residence on February 17, 2004. Approximately five days after she moved she learned that the police had entered the house.

## DISCUSSION

### I. The Trial Court Did Not Err in Denying Defendant's Motion to Suppress

As explained above, following the alleged assault on Bublak, police officers made a warrantless entry into 321 Sanford, using a key retrieved from the abandoned Volkswagon. Once inside, the police observed narcotics, narcotics paraphernalia, and ammunition. Richmond Police Detective Mitch Peixoto included those observations in an affidavit in support of a search warrant for the residence, and the magistrate issued the warrant. Defendant moved to suppress all evidence subsequently recovered from 321 Sanford. He contended the warrantless entry was unlawful, and issuance of the warrant

was based on the police officers' observations during that illegal search. Although the trial court found no exigency justified the warrantless entry, it concluded the warrant affidavit, excised of the fruits of the unlawful entry, contained probable cause for issuance of the search warrant, and the police would have sought the warrant even without the information gained during the illegal entry. The court denied defendant's motion to suppress under the independent source doctrine.

■ " 'The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. . . . [It] teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position tha[n] they would have been in if no police error or misconduct had occurred. [Citations.] When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' [Citation.]" (*People v. Weiss* (1999) 20 Cal.4th 1073, 1077–1078 [86 Cal.Rptr.2d 337, 978 P.2d 1257] (*Weiss*).) Where the affidavit supporting a search warrant contains both information obtained by unlawful conduct as well as untainted information, a two-prong test applies to justify application of the independent source doctrine. (*Id.* at pp. 1078, 1082.) First, the affidavit, *excised of any illegally obtained information*, must be sufficient to establish probable cause. (*Id.* at p. 1082.) Second, the evidence must support a finding that "the police subjectively would have sought the warrant even without the illegal conduct." (*Id.* at p. 1079; see also *id.* at p. 1082 [" 'if the application contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provided that the officers were not prompted to obtain the warrant by what they observed during the initial entry' "].) Defendant agrees that the test articulated in *Weiss* is the appropriate analysis for applying the independent source doctrine in the circumstances of this case.

In reviewing the trial court's denial of defendant's motion to suppress evidence, we defer to its factual determinations if supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673 [88 Cal.Rptr.2d 88, 981 P.2d 1019].) We then independently determine whether, under the facts as found by the trial court, the challenged police action was lawful. (*Id.* at pp. 673–674.) Although we normally accord deference to a magistrate's determination of probable cause to issue a warrant, we accord no such deference when police officers include tainted information in a warrant application. (*Weiss, supra,* 20 Cal.4th at pp. 1082–1083.) Accordingly, we determine de novo whether the search warrant affidavit is sufficient to establish probable cause to search 321 Sanford absent the information obtained by the illegal entry into that residence.

A. *It Is Proper to Consider the Information the Police Obtained by Testing the Key Retrieved from the Volkswagen in the Front Door Lock*

Defendant contends, in assessing the existence of probable cause for the warrant absent the fruit of the illegal conduct by the police, this court cannot consider the fact that the key retrieved from the Volkswagon unlocked the front door lock at 321 Sanford, because the act of testing the key was, itself, illegal. He argues that without the evidence connecting the shooter to the residence obtained by testing the key in the lock, probable cause was lacking and, therefore, the independent source doctrine is inapplicable.

At the outset, we reject the proposition that, because the officers proceeded to enter the residence after inserting and turning the key, it is improper to consider whether the act of inserting and turning the key, alone, violated the Fourth Amendment.[9] For that proposition, defendant cites only *U.S. v. Portillo-Reyes* (9th Cir. 1975) 529 F.2d 844 (*Portillo-Reyes*), in which the court stated, without any analysis or citation to authority, "the insertion of the key in the door of the [vehicle] to see if it fit constituted the beginning of the search." (*Id.* at p. 848; but see *U.S. v. Grandstaff* (9th Cir. 1987) 813 F.2d 1353, 1358, fn. 5 (*Grandstaff*) [*Portillo-Reyes* "has been undermined by intervening decisions of the [United States] Supreme Court and this court"].)[10] We agree with the reasoning of *U.S. v. Moses* (4th Cir. 2008) 540 F.3d 263, 272 (*Moses*) on the issue: "While the acts of *inserting the key* into the lock and *entering the house* were part of a continuous activity, the information obtained from inserting the key into the lock was nonetheless discrete from the information obtained from the illegal entry because the use of the key in the lock need not have led to entry of the residence at all. The officers could simply have tried the key and then left to obtain a warrant. If they improperly entered the residence (which the district court found they did), anything gleaned from the entry would obviously have to be excluded from the probable cause analysis (which it was)." (See also *Commonwealth v. Alvarez* (1996) 422 Mass. 198, 209 [661 N.E.2d 1293, 1302] (*Alvarez*) ["To analyze the situation properly, we must distinguish between two separate acts: First, inserting the key into the lock and turning it to see whether it fit, and

---

[9] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[10] Defendant's citation to *People v. Hughston* (2008) 168 Cal.App.4th 1062 [85 Cal.Rptr.3d 890] (*Hughston*) is inapposite. In that case, the police entered an area covered by tarps and then unlocked and searched the defendant's vehicle, which was *within* the area covered by the tarps. (*Id.* at p. 1067.) Because the defendant had a reasonable expectation of privacy within the area covered by the tarps, the warrantless entry violated his rights under the Fourth Amendment. (*Hughston*, at pp. 1070–1071.)

second, opening the door and conducting the walk-through search of the apartment."].) Accordingly, whether this court can properly rely on the information gained from inserting and turning the key, in determining whether the warrant is supported by probable cause under the independent source doctrine, depends on whether testing the key by itself violated the Fourth Amendment.

### 1. Was Testing the Key in the Lock a Search?

■ Defendant contends that testing the key in the lock was a search that could only be performed pursuant to a warrant. It is a close question whether inserting and turning the key constituted a search. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." (*United States v. Jacobsen* (1984) 466 U.S. 109, 113 [80 L.Ed.2d 85, 104 S.Ct. 1652], fn. omitted.)[11] The court in *U.S. v. Concepcion* (7th Cir. 1991) 942 F.2d 1170, 1172 (*Concepcion*), concluded that testing a key in an apartment door lock was a search, reasoning: "A keyhole contains *information*—information about who has access to the space beyond. As the [F]ourth [A]mendment protects private information rather than formal definitions of property, [citations], the lock is a potentially protected zone. And as the tumbler of a lock is not accessible to strangers . . . , the use of an instrument to examine its workings (that is, a key) looks a lot like a search. . . . [¶] Because the agents obtain information from the inside of the lock, which is both used frequently by the owner and not open to public view, it seems irresistible that inserting and turning the key is a 'search'." (See also *Portillo-Reyes, supra*, 529 F.2d at p. 848.)

On the other hand, other courts have concluded that law enforcement officers do not conduct a search by testing keys in external, publicly accessible locks. The court in *U.S. v. Salgado* (6th Cir. 2001) 250 F.3d 438, 456 (*Salgado*), held that "the mere insertion of a key into a lock, by an officer who lawfully possesses the key and is in a location where he has a right to be, to determine whether the key operates the lock, is not a search." The court emphasized that the defendant's apartment door was accessible to anyone passing through a hallway open to the public, and the function of the apartment door lock was to protect and keep private the contents of the apartment itself. (*Id.* at pp. 456–457; see also *U.S. v. Hawkins* (1st Cir. 1998) 139 F.3d 29, 33, fn. 1 ["insertion of a key into the lock of a storage compartment for the purpose of identifying ownership does not constitute a search"]; *U.S. v. Lyons* (1st Cir. 1990) 898 F.2d 210, 212–213 (*Lyons*)

---

[11] As further discussed below, in the recent decision in *Jones* the United States Supreme Court held that a search also occurs where a government official physically intrudes in a constitutionally protected area for the purpose of obtaining information. (*Jones, supra*, 132 S.Ct. at p. 949.) The high court referred to this as "the common-law trespassory test." (*Id.* at p. 952.)

[insertion of key into padlock of storage unit for purpose of identifying ownership did not infringe on any reasonable expectation of privacy]; *U.S. v. DeBardeleben* (6th Cir. 1984) 740 F.2d 440, 444 (*DeBardeleben*) [the defendant had no "reasonable expectation of privacy in the identity of his vehicle"]; *Mathis v. State* (Alaska 1989) 778 P.2d 1161, 1165 ["Insertion of the key did not constitute a search of the locker, but merely an identification of it as belonging to the [defendants]."]; *People v. Carroll* (1973) 12 Ill.App.3d 869 [299 N.E.2d 134, 139] [insertion and turning of key not a search].)

In *Jones, supra*, 565 U.S. \_\_\_ [132 S.Ct. 945], the United States Supreme Court recently considered whether attaching a global positioning system (GPS) device to a vehicle, and then using the device to track the vehicle's movements, constitutes a search under the Fourth Amendment. There, law enforcement officers obtained a search warrant authorizing the installation of a GPS device on a vehicle that was registered to the defendant's wife, but the officers installed the device in the wrong locality and one day after the warrant expired. (*Jones*, at p. \_\_\_ [132 S.Ct. at p. 948].) The officers used the device to track the vehicle's movements for 28 days. (*Ibid.*) In concluding that the installation and use of the GPS device was a search, the high court did not focus on whether the defendant had a " 'reasonable expectation of privacy' " in the object of the search. (*Id.* at pp. \_\_\_–\_\_\_ [132 S.Ct. at pp. 949–950].) Instead, the high court focused on whether there had been a "common-law trespass" (*id.* at p. \_\_\_ [132 S.Ct. at p. 949]), a " 'physical intrusion of a constitutionally protected area' " (*id.* at p. \_\_\_ [132 S.Ct. at p. 951]). *Jones* explained, "At bottom, we must 'assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.' [Citation.] . . . [F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." (*Id.* at p. \_\_\_ [132 S.Ct. at p. 950], fn. omitted.)[12] The law enforcement officers had committed a warrantless search because, in attaching the GPS device to the undercarriage of the target vehicle, the officers "physically occupied private property for the purpose of obtaining information." (565 U.S. at p. \_\_\_ [132 S.Ct. at p. 949].)

Importantly, *Jones* treated as forfeited the government's alternative argument that "even if the attachment and use of the device was a search, it was reasonable—and thus lawful—under the Fourth Amendment because 'officers had reasonable suspicion, and indeed probable cause, to believe that [Jones]

[12] The high court did not question the validity of the reasonable expectation of privacy test for finding a violation of the Fourth Amendment; instead, *Jones* held that a violation also could be established under the common law trespassory test. (*Jones, supra*, 565 U.S. at pp. \_\_\_–\_\_\_ [132 S.Ct. at pp. 950–953]; see also *id.* at p. \_\_\_ [132 S.Ct. at p. 952 [the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test"]; *id.* at pp. \_\_\_–\_\_\_ [132 S.Ct. at pp. 954–955] (conc. opn. of Sotomayor, J.).)

was a leader in a large-scale cocaine distribution conspiracy.' " (*Jones, supra,* 565 U.S. at p. ___ [132 S.Ct. at p. 954].) Accordingly, *Jones* is only relevant in the present case on the issue of whether there was a search; *Jones* did not address whether and to what extent any exceptions to the warrant requirement are applicable to searches, trespassory or otherwise.

In a post-*Jones* case, the court in *U.S. v. Cowan* (8th Cir. 2012) 674 F.3d 947, 956 (*Cowan*), concluded that a police detective did not commit a trespass when he located a suspect's car in a parking lot by using the suspect's key fob to trigger the car's alarm. The court reasoned that the detective had lawfully seized the key fob and the "mere transmission of electric signals alone" through the key fob was not a trespass on the car. (*Ibid.*) The situation in the present case is closer because, although the officers lawfully seized the key, testing it required the officers to physically insert and turn the key in the lock. (See *Jones, supra,* 565 U.S. at p. ___ [132 S.Ct. at p. 962] (conc. opn. of Alito, J.) ["Trespass to chattels has traditionally required a physical touching of the property."].) Defendant contends that testing a key in the front door of a residence would have constituted a trespass at common law and, therefore, it constitutes a search under *Jones*. The People dispute that merely testing a key would have constituted a trespass at common law. Both parties present competing authorities characterizing the common law in support of their respective positions. Moreover, a separate issue that may be relevant in determining whether a common law trespass occurred is: Did defendant possess a sufficient property interest in 321 Sanford, or in the lock itself, to support a trespass claim? (See *Jones,* at p. ___, fn. 2 [132 S.Ct. at p. 949, fn. 2] [noting that the government had not challenged the defendant's standing to object and asserting that the defendant "had at least the property rights of a bailee"]; *id.* at pp. ___–___ [132 S.Ct. at pp. 961–962] (conc. opn. of Alito, J.) [noting complexities arising from property rights analysis].) That is an issue not well developed in our record.[13] Thus, even under the *Jones* common law trespassory test, the determination whether testing a key constitutes a search is not straightforward.[14]

---

[13] The record shows the 321 Sanford residence was rented by defendant's sister-in-law, and defendant's mother previously lived there. Defendant's mother testified that defendant's brother Thrower sold heroin from the residence and that defendant visited her there and kept clothes in the house.

[14] Another post-*Jones* decision, *U.S. v. Flores-Lopez* (7th Cir. 2012) 670 F.3d 803, 807 (*Flores-Lopez*), asserts that "any doubts" about *Concepcion*'s conclusion that testing a key is a search "have been scotched" by *Jones*. *Flores-Lopez,* however, does not analyze the applicable common law.

### 2. *Assuming Testing the Key Was a Search, It Was Reasonable*

■ Ultimately, we need not determine whether testing the key in the lock was a search because, even assuming it was a search, the search was not unreasonable. "The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' [Citation.]" (*United States v. Knights* (2001) 534 U.S. 112, 118–119 [151 L.Ed.2d 497, 122 S.Ct. 587] (*Knights*); see *People v. Sanders* (2003) 31 Cal.4th 318, 333 [2 Cal.Rptr.3d 630, 73 P.3d 496] (*Sanders*); see also *People v. Boulter* (2011) 199 Cal.App.4th 761, 768 [131 Cal.Rptr.3d 185] (*Boulter*).) "Whether an officer's conduct was reasonable is evaluated on a case-by-case basis in light of the totality of the circumstances." (*In re Raymond C.* (2008) 45 Cal.4th 303, 307 [86 Cal.Rptr.3d 110, 196 P.3d 810]; see also *Knights*, at p. 118; *Sanders*, at p. 333; *Boulter*, at p. 768.)

### a. *The Minimal Intrusion Exception to Warrant Requirement*

■ "[I]n most criminal cases," the balance between an individual's Fourth Amendment interests and the promotion of legitimate governmental interests "is struck in favor of the procedure described by the warrant clause (viewing a search as reasonable if conducted pursuant to a warrant that has been issued by a neutral magistrate upon a showing of probable cause) . . . ." (*Loder v. City of Glendale* (1997) 14 Cal.4th 846, 867–868 [59 Cal.Rptr.2d 696, 927 P.2d 1200].) Nevertheless, the United States Supreme Court has "made it clear that there are exceptions to the warrant requirement. When faced with special law enforcement needs, diminished expectations of privacy, *minimal intrusions*, or the like, [it] has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." (*Illinois v. McArthur* (2001) 531 U.S. 326, 330 [148 L.Ed.2d 838, 121 S.Ct. 946], italics added.)[15] In the present case, we focus on the minimal nature of the intrusion involved in testing the key, because "even if the challenged action triggers the protections of the Fourth Amendment, a 'minimally intrusive' action 'may be reasonable in view of the government interests it serves.' " (*U.S. v. $109,179 in U.S. Currency* (9th Cir. 2000) 228 F.3d 1080, 1087, fn. omitted; see also, e.g., *New York v. Class* (1986) 475 U.S. 106, 117 [89 L.Ed.2d 81, 106 S.Ct. 960] [officer's search of car dashboard for vehicle identification number obscured by papers was a "minimal" intrusion]; *Hayes v. Florida* (1985) 470 U.S. 811,

---

[15] Defendant argues testing the key in the lock was not justifiable under the "special needs" exception to the warrant requirement (see, e.g., *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 619–620 [103 L.Ed.2d 639, 109 S.Ct. 1402]), but we do not rely on that doctrine in concluding that testing the key did not, in the present case, violate the Fourth Amendment.

816–817 [84 L.Ed.2d 705, 105 S.Ct. 1643] (*Hayes*) [suggesting in dicta that officers could seize and fingerprint a suspect in the field, a procedure the high court characterized as a nonintrusive search, on the basis of reasonable suspicion];[16] *Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111 [54 L.Ed.2d 331, 98 S.Ct. 330] (*Mimms*) [order that driver of properly detained vehicle get out of car was "*de minimis*" intrusion]; *Arizona v. Johnson* (2009) 555 U.S. 323, 331 [172 L.Ed.2d 694, 129 S.Ct. 781] [citing *Mimms* with approval]; *U.S. v. White* (9th Cir. 1985) 766 F.2d 1328, 1332 (*White*) [border patrol agent's act of pushing down on the trunk of an automobile to determine whether the trunk contained heavy objects requiring further investigation, if a search, was a reasonable minimal intrusion].)

■ The minimal intrusion exception to the warrant requirement rests on the conclusion that in a very narrow class of "searches" the privacy interests implicated are "so small that the officers do not need probable cause" for the search to be reasonable. (*Concepcion, supra*, 942 F.2d at p. 1173; see also *id.* at p. 1172 ["although a warrant may be an essential ingredient of reasonableness much of the time, for less intrusive searches it is not"].)[17] For example, in *Hayes, supra*, 470 U.S. at page 814, the high court stated that "fingerprinting, because it involves neither repeated harassment nor any of the probing into private life and thoughts that often marks interrogation and search, represents a much less serious intrusion upon personal security than other types of searches and detentions." Of course, as discussed below (see, *post*, at pp. 253–254), the search must be justified by other circumstances, such as reasonable suspicion and legitimate governmental interests.

As explained by Judge Posner in *Flores-Lopez*, the minimal intrusion exception was not at issue in *Jones*. In *Flores-Lopez*, the police arrested the defendant, a suspected drug dealer. (*Flores-Lopez, supra*, 670 F.3d at p. 804.)

---

[16] The high court stated, "There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch." (*Hayes, supra*, 470 U.S. at p. 817.) Although that statement was dicta, it was " 'carefully considered language' " that should be accorded weight. (*U.S. v. Dorcely* (D.C. Cir. 2006) 372 U.S. App.D.C. 170 [454 F.3d 366, 375].) In fact, the only objection raised by the concurring opinion in *Hayes* was that the majority had "virtually" held "that on-site fingerprinting without probable cause or a warrant is constitutionally reasonable." (*Hayes*, at p. 819 (conc. opn. of Brennan, J.); see also *U.S. v. Askew* (D.C. Cir. 2008) 381 U.S. App.D.C. 415 [529 F.3d 1119, 1157–1159] (dis. opn. of Kavanaugh, J.) (*Askew*).)

[17] As other courts have pointed out, where a purported search is only minimally intrusive, it can be difficult to draw a clear line between acts that do not constitute searches and those that constitute reasonable warrantless searches under the Fourth Amendment. (*Grandstaff, supra*, 813 F.2d at p. 1358, fn. 5; *White, supra*, 766 F.2d at pp. 1331–1332.) In the narrow range of cases where the minimal intrusion exception applies, the distinction is not critical. (*Grandstaff*, at p. 1358, fn. 5; *White*, at p. 1332; see also *Lyons, supra*, 898 F.2d at pp. 212–213.)

Without obtaining a warrant, the police searched the defendant's cell phone for its phone number; the police later used the number to subpoena the phone's call history from the telephone company. (*Ibid.*) Even though there was no urgent need to search the cell phone for its phone number, *Flores-Lopez* pointed out "that bit of information might be so trivial that its seizure would not infringe the Fourth Amendment." (*Id.* at pp. 806–807.)[18] The court pointed out it had held in *Concepcion* "that a minimally invasive search [of turning a key in a lock] may be lawful in the absence of a warrant, even if the usual reasons for excusing the failure to obtain a warrant are absent . . . ." (*Flores-Lopez*, at p. 807.) *Flores-Lopez* asserted that *Concepcion*'s holding "survives *Jones*, which declined to decide whether the search entailed in attaching a GPS device requires a warrant. [Citation.]" (*Flores-Lopez*, at p. 807.)[19] We agree: *Jones* did not have occasion to consider under what circumstances a warrantless minimal intrusion can be reasonable under the Fourth Amendment because the government "forfeited" the argument that the search was reasonable. (*Jones, supra*, 565 U.S. at p. ___ [132 S.Ct. at p. 954].)

We recognize that the United States Supreme Court has provided little guidance regarding the application of this exception to the warrant require-ment.[20] We asked the parties to address the applicability of the exception in the present case, and referred them to the concurring opinion authored by Judge Griffith in the en banc decision in *Askew, supra*, 529 F.3d at pages 1144–1149.

---

[18] We are not aware of any California decision that has applied the minimal intrusion exception, and the parties have directed us to no such decision. Notably, the Supreme Court *has* addressed the cell phone search issue presented in *Flores-Lopez*. In *People v. Diaz* (2011) 51 Cal.4th 84, 88 [119 Cal.Rptr.3d 105, 244 P.3d 501] (*Diaz*), an officer searched the "text message folder" of a cell phone found on the defendant's person during a search incident to his arrest. The court concluded that the search of the cell phone did not violate the Fourth Amendment because law enforcement officers are permitted to examine property found during a search of a person incident to a lawful arrest. (*Diaz*, at pp. 98–99.) Given the nature of its ruling, the court had no need to discuss the minimal intrusion exception.

[19] In the same sentence, *Flores-Lopez* also stated that *Concepcion*'s holding is "implied" in *United States v. Robinson* (1973) 414 U.S. 218, 236 [38 L.Ed.2d 427, 94 S.Ct. 467] (*Robinson*). Although *Robinson* was very relevant to *Flores-Lopez* because *Robinson* addressed the permissibility of a search of a container found on the person of an arrestee (*Robinson*, at p. 236; *Flores-Lopez, supra*, 670 F.3d at p. 805), we do not read *Robinson* as implying anything about the minimal intrusion exception to the warrant requirement, as applied in *Concepcion*.

[20] There is some academic support for a minimal intrusion exception. (Pollack, *Stretching the Terry Doctrine to the Search for Evidence of Crime: Canine Sniffs, State Constitutions, and the Reasonable Suspicion Standard* (1994) 47 Vand. L.Rev. 803; Cloutier, *Arizona v. Hicks: The Failure to Recognize Limited Inspections as Reasonable in Fourth Amendment Jurisprudence* (1991) 24 Colum. J.L. & Soc. Probs. 351.) Although these articles reflect a somewhat different understanding of the scope of the exception, it appears that both would support application of the exception in the present case.

In *Askew*, the majority of the en banc panel held that a police officer violated the Fourth Amendment by unzipping the defendant's jacket during an identification show-up procedure. (*Askew, supra,* 529 F.3d at pp. 1122–1123.) Judge Griffith wrote separately to, among other things, emphasize that it was "immaterial" that "the unzipping may have been minimally intrusive." (*Id.* at p. 1144 (conc. opn. of Griffith, J.).) Judge Griffith asserted that minimally intrusive searches are only permitted where necessary for officer safety (*id.* at pp. 1144–1145 (conc. opn. of Griffith, J.)) and that the United States Supreme Court has never upheld " 'a search on reasonable suspicion merely because it was minimally intrusive' " (*id.* at p. 1147 (conc. opn. of Griffith, J.)). Judge Griffith acknowledged that the high court had upheld minimally intrusive *seizures* on the basis of reasonable suspicion, but relied upon the "textual distinction between 'searches' and 'seizures' " to justify the application of different rules to each type of police conduct. (*Ibid.*)[21]

In his supplemental brief, defendant adopts the position articulated in Judge Griffith's concurrence. *Askew* is distinguishable, however, because the person of the defendant was searched, and such searches, which intrude upon the "sanctity of the person" (*Terry v. Ohio* (1968) 392 U.S. 1, 17 [20 L.Ed.2d 889, 88 S.Ct. 1868]), may be outside the scope of the minimal intrusion exception, at least absent an especially compelling rationale such as officer safety. Similarly, searches that intrude upon the "sanctity of the home" (*Kyllo v. United States* (2001) 533 U.S. 27, 37 [150 L.Ed.2d 94, 121 S.Ct. 2038] (*Kyllo*)) may be outside the scope of the minimal intrusion exception. (See, *post,* p. 252.)

 Although the United States Supreme Court has not clearly articulated the parameters of the exception, federal authorities provide sufficient support for concluding that, in appropriate circumstances, the minimal intrusion exception to the warrant requirement may be applied to uphold warrantless searches based on less than probable cause. Moreover, although the high court's decisions in the area have primarily been justified by officer safety concerns (see *Askew, supra,* 529 F.3d at pp. 1144–1145 (conc. opn. of Griffith, J.); but see *Hayes, supra,* 470 U.S. at pp. 814–817), nothing in the

---

[21] Although we have not undertaken an exhaustive examination of the issue, it does not appear that the claimed distinction between searches and seizures is universally recognized. In *Arizona v. Hicks* (1987) 480 U.S. 321, 328 [94 L.Ed.2d 347, 107 S.Ct. 1149], the high court stated, "Although the interest protected by the Fourth Amendment injunction against unreasonable searches is quite different from that protected by its injunction against unreasonable seizures [citation], neither the one nor the other is of inferior worth or necessarily requires only lesser protection. We have not elsewhere drawn a categorical distinction between the two insofar as concerns the degree of justification needed to establish the reasonableness of police action, and we see no reason for a distinction in the particular circumstances before us here."

high court's jurisprudence appears to preclude the possibility that a justification less than officer safety could be sufficient to justify an intrusion as minimal as that involved in the present case.

### b. *The Minimal Intrusion Exception Is Applicable Here*

As pointed out in *Flores-Lopez, supra*, 670 F.3d at page 807, the court in *Concepcion* applied the minimal intrusion exception to the warrant requirement, even though the court never used the phrase "minimal intrusion." *Concepcion* is directly on point in the present case. There, United States Drug Enforcement Administration agents arrested the defendant and seized keys pursuant to the arrest. (*Concepcion, supra*, 942 F.2d at p. 1171.) The agents then used one of the keys to unlock an apartment door in a nearby building; the agents had previously observed the defendant entering the building. (*Ibid.*) Confronted with that information, the defendant consented to a search of the apartment, where the agents found cocaine. (*Ibid.*) Although the court concluded that testing the key in the apartment door lock was a search, the court emphasized the minimal degree of the intrusion on Fourth Amendment interests in determining that officers did not need a warrant or probable cause to undertake that search. (*Concepcion*, at pp. 1172–1173.) The court reasoned that the act only minimally invaded the defendant's "interest in security of information" because the police could have verified his connection to the apartment in other ways. (*Id.* at p. 1173.) In other words, because the information ascertainable by testing the key was not genuinely private information—and, of course, the police were not in a private area at the time of the search—the intrusion was minimal. (*Ibid.* ["The information the agents obtained from putting the key in the lock thus was no secret."].) Ultimately, the court held, "Although the owner of a lock has a privacy interest in a keyhole—enough to make the inspection of that lock a 'search'—the privacy interest is so small that the officers do not need probable cause to inspect it. Because agents are entitled to learn a suspect's address without probable cause, the use of the key to accomplish that objective did not violate the [F]ourth [A]mendment." (*Ibid.*; see also 1 LaFave, Search and Seizure (4th ed. 2004) § 2.3(b), pp. 571–572 [favorably describing *Concepcion* decision].)

On facts similar to those in *Concepcion*, the Supreme Judicial Court of Massachusetts applied the minimal intrusion exception in concluding that testing a key in an apartment door lock, if a search, was reasonable. (*Alvarez, supra*, 661 N.E.2d at p. 1302.) The court reasoned that the police do not need probable cause to use a key "to conduct a warrantless search of a lock tumbler," because "[g]iven the nature of the lock mechanism, which was accessible from a common hallway, any expectation of privacy in the contents of the lock tumbler was minimal." (*Ibid.*; see also *Cole v. State* (Tenn.Crim.App. 1993) 858 S.W.2d 915, 916–917.)

Other decisions have also emphasized the minimal degree of intrusion on privacy interests involved in testing a key, without expressly applying the minimal intrusion exception. In *Lyons, supra*, 898 F.2d at page 213, the court concluded that testing a key in a padlock in order to determine whether the defendant had access to a storage unit was not a search "or at least, not an unreasonable search." The court emphasized that the contents of the storage unit were "the object of the lessee's privacy expectations, not the padlock." (*Ibid.*) Similarly, the court in *U.S. v. $109,179 in U.S. Currency, supra*, 228 F.3d at page 1088, concluded that testing a key in a car door in order to determine whether the car belonged to the defendant was "not an unreasonable search." The court reasoned that the defendant had "a minimal expectation of privacy in the lock" and "[f]itting the key into the car door lock did not give police any knowledge about the contents inside the vehicle." (*Ibid.*) Though not expressly stated in the opinion, it appears the court concluded that testing the key was a reasonable search based on the minimal intrusion exception, because the court stated the proposition that "a 'minimally intrusive' action 'may be reasonable in view of the government interests it serves.' " (*Id.* at p. 1087, quoting *White, supra*, 766 F.2d at p. 1330.)[22]

In *Salgado, supra*, 250 F.3d at pages 456–457, the court did not apply the minimal intrusion exception because it concluded that testing a key in an apartment door lock was *not* a search. But the court did emphasize the accessibility of the external locks and noted that the function of locks is to protect privacy *inside* the residence: "[T]he lock to [the defendant's] apartment was accessible by means of an unlocked, common hallway which was open to the public. [The defendant] had no reasonable expectation of privacy in this hallway. The lock to his apartment door was just as accessible to anyone passing through that hallway as the lock on his car door was to anyone passing through the building's parking lot. Just as the lock on a car door is designed to protect any property left in the car and to ensure privacy inside the vehicle, an apartment door lock functions to protect and keep private the contents of the apartment. The information gained by the officers in inserting a key into an apartment door is the same as that gained by inserting a key into a car door, namely, that the key works the lock." (*Id.* at pp. 456–457; see also *U.S. v. Cowan, supra*, 674 F.3d at p. 955 ["Pressing the alarm button on the key fob was a way to identify the car and did not tell officers anything about the fob's code or the car's contents."].)

---

[22] Defendant points out that several of the cases relied upon by the People involve automobiles, and persons have a diminished expectation of privacy in their automobiles. (See, e.g., *U.S. v. $109,179 in U.S. Currency, supra*, 228 F.3d at p. 1088.) However, in those cases the diminished expectation of privacy in automobiles was only one of several considerations, and the reasoning we rely on also applies outside the automobile context. (See *Flores-Lopez, supra*, 670 F.3d at p. 806; *Salgado, supra*, 250 F.3d at p. 457.) Moreover, many of the decisions cited herein do not involve automobiles.

■ It is critical to our analysis that the testing of the key, if a search, was a search of the lock, not a search disclosing anything regarding the contents of the house. "In the home, . . . *all* details are intimate details, because the entire area is held safe from prying government eyes." (*Kyllo, supra,* 533 U.S. at p. 37.) For that reason, "the Fourth Amendment draws 'a firm line at the entrance to the house.' " (*Id.* at p. 40.) This case involves an intrusion precisely on that line, but not an intrusion into the "sanctity of the home." (*Id.* at p. 37; see *Concepcion, supra,* 942 F.2d at p. 1172 ["The area outside one's door lacks anything like the privacy of the area inside."]; *Salgado, supra,* 250 F.3d at p. 457 [the privacy interests implicated by searches inside a home are not implicated by testing a key in a lock].)[23] That is, the search of the lock did not disclose *any* of the contents of the home; it disclosed only public information in which defendant had little expectation of privacy.[24] Accordingly, those decisions involving intrusions into the privacy of the home do not control the determination of the degree of the intrusion involved in the present case and the justification required for the intrusion. (See, e.g., *Hicks, supra,* 480 U.S. at p. 328 [in case involving search of underside of turntable inside the defendant's apartment, stating that "[a] dwelling-place search . . . requires probable cause"]; *Kyllo,* at p. 37 [in case involving thermal imaging

---

[23] Of course, a home's " 'curtilage,' the land immediately surrounding and associated with the home," "has been considered part of the home itself for Fourth Amendment purposes." (*Oliver v. United States* (1984) 466 U.S. 170, 180 [80 L.Ed.2d 214, 104 S.Ct. 1735].) But that did not prohibit the police officers from approaching the front door of 321 Sanford. (See, e.g., *U.S. v. Taylor* (4th Cir. 1996) 90 F.3d 903, 909 [the "front entrance was as open to the law enforcement officers as to any delivery person, guest, or other member of the public"]; see also *United States v. Dunn* (1987) 480 U.S. 294, 300 [94 L.Ed.2d 326, 107 S.Ct. 1134] [in identifying the curtilage, the "central" inquiry is "whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life." ' [Citation.]"].)

[24] Generally speaking, an individual does not have a reasonable expectation of privacy in the location of his or her residence, because that is a fact open to public view. (See *Concepcion, supra,* 942 F.2d at p. 1173; cf. *Grandstaff, supra,* 813 F.2d at p. 1358, fn. 6 ["There is little, if any, reasonable expectation of privacy in the identity of one's vehicle. [Citation.] One can be freely observed while in the vehicle, or while entering or leaving it."].) In the present case in particular, there is no indication in the record that defendant's connection to 321 Sanford was private information, concealed from public view. (See *Concepcion,* at p. 1173.) To the contrary, defendant in broad daylight retrieved an assault rifle from the area of the house and engaged in a firefight while standing in front of the parcel where the house was located. Moreover, police officers could have ascertained the connection between the crime and the house because defendant's sister-in-law was listed on both the title for the Volkswagen and the lease agreement for 321 Sanford. (See *Grandstaff,* at p. 1358, fn. 6 [in assessing reasonableness of expectation of privacy, noting that "registered ownership" of car could be ascertained from license plates]; *Concepcion,* at p. 1173.)

of a home, stating that "In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes."].)[25]

The "search" involved in the present case is comparable to the canine sniff considered in *United States v. Place* (1983) 462 U.S. 696 [77 L.Ed.2d 110, 103 S.Ct. 2637]. There, the high court held, "the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a 'search' within the meaning of the Fourth Amendment." (*Id.* at p. 707; accord, *Illinois v. Caballes* (2005) 543 U.S. 405, 409 [160 L.Ed.2d 842, 125 S.Ct. 834].) Although the arguably trespassory aspect of testing a key may, under *Jones*, preclude a conclusion that there was no search in the present case, testing a key is, like a canine sniff, an investigatory procedure that is very limited in terms of the information it reveals. Naturally, we do not mean to suggest that the information disclosed is unimportant. In the present case, for example, testing the key in the lock helped establish a connection between defendant and 321 Sanford. But, as relevant to determining the extent of any privacy intrusion, key testing is a limited investigatory procedure in the sense that it reveals only the likelihood of a connection between the possessor of the key and a given location, and not anything about the contents of that location.

The other critical consideration is the justification for the intrusion. Although the *Concepcion* decision focused entirely on the minimal privacy interests implicated by the search of the lock (*Concepcion, supra*, 942 F.2d at p. 1173), it is also appropriate to consider the degree to which the search " 'is needed for the promotion of legitimate governmental interests,' " because that is the other side of the balancing in the determination of reasonableness (*Knights, supra*, 534 U.S. at pp. 118–119).[26] (See also *Hayes, supra*, 470 U.S. at p. 817 [in dicta, requiring, among other things, reasonable suspicion of

---

[25] Similarly, as noted previously (*ante*, at p. 249), those decisions involving intrusions into the "sanctity of the person" (*Terry v. Ohio, supra*, 392 U.S. at p. 17), also do not control the determination of the reasonableness of the search in the present case.

[26] Language in the *Flores-Lopez* decision *could* be read to suggest otherwise. The court first suggested that the cell phone search was reasonable because it was minimally intrusive. (*Flores-Lopez, supra*, 670 F.3d at pp. 806–807.) But the court apparently concluded it was unnecessary to rest its holding on that basis, stating, *"But set all this to one side and assume that justification is required* for police who have no warrant to look inside a cell phone even if all they're looking for and all they find is the phone number." (*Id.* at p. 807, italics added.) The court then proceeded to conclude that the search was justified by the slight risk that an accomplice could have remotely "wiped the data from the defendant's cell phone before the government could obtain a search warrant." (*Id.* at p. 809.) Despite the language suggesting

criminality to justify field fingerprinting].) In the present case, testing the key in the lock "served the discrete investigative purpose of confirming that" the shooter had access to 321 Sanford. (*Moses, supra*, 540 F.3d at p. 272; see also *Lyons, supra*, 898 F.2d at p. 213 ["the insertion of the key into the padlock was merely a means of identifying a storage unit to which [the defendant] had access"]; *DeBardeleben, supra*, 740 F.2d at p. 443 ["There was therefore a legitimate reason to insert the keys . . . to see whether they fit in order to identify that automobile as belonging to [the] defendant for purposes of obtaining a search warrant." (fn. omitted)].)

Moreover, regardless of whether the police had probable cause to believe that there was evidence inside the residence without trying the key in the lock, the police certainly reasonably suspected the residence was connected to the serious crime under investigation. (*United States v. Martinez-Fuerte* (1976) 428 U.S. 543, 560–561 [49 L.Ed.2d 1116, 96 S.Ct. 3074] ["to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure"]; *DeBardeleben, supra*, 740 F.2d at p. 445 [insertion of key was supported "by a 'founded suspicion' and by the legitimate crime investigation"]; *Alvarez, supra*, 661 N.E.2d at p. 1302 ["for such an unobtrusive search, the police needed only a founded or reasonable suspicion to insert the key"]; *Cole v. State, supra*, 858 S.W.2d at p. 917 ["the privacy interests in an exterior lock are so inconsequential that the intrusion requires neither a search warrant nor probable cause, only a founded suspicion"].) Although the police could have established the connection between the crime and the residence through other means (see, *ante*, at p. 252, fn. 24), that likely would have significantly delayed the investigation. Accordingly, although it ultimately may not have been *necessary* for the police to test the key in order to obtain a search warrant, testing the key strongly promoted the legitimate governmental interest in quickly identifying the still-armed individual who shortly before had used an assault rifle in a firefight, in the daytime, in a residential neighborhood, and then used it to commit an assault on a police officer.

In sum, assuming the challenged key testing in the present case was a search, the search was based on reasonable suspicion and served legitimate investigative purposes, without disclosing anything about the contents of the residence or any information of a private nature. Although the police acted *unreasonably* in proceeding to enter the house without a warrant, they acted *reasonably* in testing the key in the lock—an act which was minimally intrusive but had the potential to expedite capture of the armed assailant by

that no justification for the search is required under the minimal intrusion exception, *Flores-Lopez* is better understood as applying the minimal intrusion exception by balancing the intrusion against the government interest involved: The court ultimately concluded the search was reasonable because, although the justification for proceeding without a warrant was not great, "the 'invasion,' limited as it was to the cell phone's number, was also slight." (*Ibid.*)

establishing a connection between the crime and the residence. Based on the above reasoning and authorities, in the circumstances of the present case, testing the key in the front door lock of 321 Sanford was not, by itself, an unreasonable search under the Fourth Amendment, even though the act was not authorized by a warrant and regardless of whether the police had probable cause to believe there was evidence in the residence before testing the key in the lock. Accordingly, the information the police gained by testing the key in the lock is properly considered by this court in determining whether the warrant issued after the illegal entry was supported by probable cause.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV. *The Trial Court Erred in Staying the Section 186.22(b)(1)(C) Gang Enhancement*

In their cross-appeal, the People contend the trial court erred in staying the 10-year section 186.22(b)(1)(C) gang enhancement to count 1. The issue "involves the interplay between two highly complex statutes: section 186.22, which targets participants in criminal street gangs; and section 12022.53 . . . , which 'prescribes substantial sentence enhancements for using a firearm in the commission of certain listed felonies' [citation]." (*People v. Brookfield* (2009) 47 Cal.4th 583, 588 [98 Cal.Rptr.3d 535, 213 P.3d 988] (*Brookfield*).)

■ "Where, as here, the issue presented is one of statutory construction, our fundamental task is 'to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citations.] We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation.] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' [Citation.] If, however, the statutory language is ambiguous, 'we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history.' [Citation.] Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.] Any interpretation that would lead to absurd consequences is to be

*See footnote, *ante*, page 232.

avoided. [Citation.]" (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].)

## A. *The Procedural Background and the* Rodriguez *Decision*

■ The section 186.22(b)(1)(C) enhancement applies to a violent felony committed to benefit a criminal street gang.[34] (See *Brookfield, supra,* 47 Cal.4th at p. 589.) Here, defendant's crime was a violent felony because the jury found true the section 12022.53(b) enhancement for personal use of a firearm in a specified offense.[35] (§ 667.5, subd. (c)(22).) Assault with a firearm on a peace officer in violation of section 245, subdivision (d) is one of the specified offenses. (§ 12022.53, subd. (a)(7).) On August 14, 2009, the trial court sentenced defendant to a prison term of 30 years, including consecutive terms of 10 years for both the section 12022.53(b) and section 186.22(b)(1)(C) enhancements. On August 31, the court vacated the sentence in light of the Supreme Court's then new decision in *Rodriguez, supra,* 47 Cal.4th 501. The court interpreted *Rodriguez* as prohibiting imposition of both the section 12022.53(b) and the section 186.22(b)(1)(C) enhancements. The trial court resentenced defendant and imposed a prison term of 29 years four months, including a 10-year enhancement on count 1 under section 12022.53(b); the court stayed the 10-year enhancement under section 186.22(b)(1)(C).

In *Rodriguez,* the defendant fired several shots at three individuals associated with a rival gang. (*Rodriguez, supra,* 47 Cal.4th at p. 504.) The defendant was convicted of three counts of assault with a firearm (§ 245, subd. (a)(2)), and the jury also found that he personally used a firearm (§ 12022.5, subd. (a))[36] and committed a violent felony to benefit a criminal street gang (§ 186.22(b)(1)(C)). (*Rodriguez,* at pp. 504–505.) With respect to each offense, the trial court imposed both the firearm enhancement and the

[34] Section 186.22(b)(1)(C) provides in relevant part: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years."

[35] Section 12022.53(b) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply."

[36] Section 12022.5, subdivision (a) provides in relevant part: "any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment . . . for 3, 4, or 10 years . . . ." (See *Rodriguez, supra,* 47 Cal.4th at p. 505.)

gang enhancement. (*Id.* at pp. 504, 506.) The Supreme Court held that this violated section 1170.1, subdivision (f) (hereafter section 1170.1(f)), which provides in pertinent part: "When two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed for that offense. . . ." The court reasoned that both the firearm enhancement and the gang enhancement punished the defendant for using a firearm. (*Rodriguez,* at pp. 508–509.) It was clear the section 12022.5 enhancements punished the defendant for using a firearm during the commission of the assaults. (*Rodriguez,* at p. 508.) And, as the court explained, so did the gang enhancements: "Here, defendant became eligible for this 10-year punishment *only* because he 'use[d] a firearm which use [was] charged and proved as provided in . . . Section 12022.5.' (§ 667.5, subd. (c)(8).) Thus, defendant's firearm use resulted in additional punishment not only under section 12022.5's subdivision (a) (providing for additional punishment for personal use of a firearm) but also under section 186.22's subdivision (b)(1)(C), for committing a violent felony as defined in section 667.5, subdivision (c)(8) (by personal use of a firearm) to benefit a criminal street gang." (*Rodriguez,* at p. 509.) Accordingly, the imposition and execution of both enhancements violated section 1170.1(f), and the court remanded the matter for resentencing. (*Rodriguez,* at p. 509.)

Similarly here, a firearm enhancement was imposed under section 12022.53(b) because defendant personally used a firearm in committing a specified offense, assault with a firearm on a peace officer. And with respect to the gang enhancement, as the People concede, defendant became eligible for the section 186.22(b)(1)(C) enhancement because the assault constituted a "violation of section 12022.53," which made it qualify as a violent felony (§ 667.5, subd. (c)(22)). Thus, defendant's firearm use resulted in additional punishment under both section 12022.53(b) and section 186.22(b)(1)(C). This led the trial court to conclude that section 1170.1(f) obligated it to stay the section 186.22(b)(1)(C) enhancement.

### B. *The Conflict Between Sections 1170.1(f) and 12022.53(e)(2)*

The People argue the trial court erred in staying the section 186.22(b)(1)(C) enhancement because the Legislature intended for both enhancements to be imposed in circumstances where the defendant personally used a firearm in a specified felony. In particular, section 12022.53(e)(2) provides: "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, *unless* the person personally used or personally discharged a firearm in the commission of the offense." (Italics added.) Section 12022.5, at issue in

*Rodriguez,* contains no analogous provision. The Supreme Court interpreted section 12022.53(e)(2) in *Brookfield, supra,* 47 Cal.4th 583. It stated that section 12022.53(e) "explains how a trial court is to sentence a defendant in a case in which the provisions of sections 186.22 and 12022.53 *both* apply," and under section 12022.53(e)(2), "[a] defendant who *personally* uses or discharges a firearm in the commission of a gang-related offense is subject to *both* the increased punishment provided for in section 186.22 *and* the increased punishment provided for in section 12022.53." (*Brookfield,* at p. 590; see also *id.* at p. 593 ["offenders who personally used or discharged a firearm in committing a gang-related offense that is specified in section 12022.53 . . . are subject to *both* . . . the harsh enhancement provisions of 12022.53 *and* the gang-related sentence increases of section 186.22"]; *id.* at p. 594 ["a defendant who *personally* used or discharged a firearm in a gang-related felony specified in section 12022.53 will be subject to greater punishment for *both* gang participation under section 186.22 *and* firearm use under section 12022.53"]; *People v. Campos* (2011) 196 Cal.App.4th 438, 447 [126 Cal.Rptr.3d 274]; *People v. Salas* (2001) 89 Cal.App.4th 1275, 1281–1282 [108 Cal.Rptr.2d 137].)

Although defendant characterizes that aspect of *Brookfield*'s interpretation of section 12022.53(e)(2) as dicta, he does not dispute that *Brookfield*'s interpretation is a proper, plain language construction of the statute. The crux of defendant's argument is that section 1170.1(f), prohibiting the imposition of multiple firearm enhancements, should prevail because section 12022.53(e)(2) does not expressly state that both enhancements should be imposed notwithstanding section 1170.1(f).

 We conclude that section 12022.53(e)(2), which expressly authorizes imposition of both enhancements in the circumstances of this case, is in conflict with section 1170.1(f), which directs that only one firearm enhancement be imposed. We reject defendant's contention that section 12022.53(e)(2)'s silence regarding section 1170.1(f) means there is no conflict, because the former provision clearly reflects the Legislature's intent that both the section 12022.53(b) and the section 186.22(b)(1)(C) enhancements be imposed where a defendant personally used a firearm. That intent cannot be accomplished if section 1170.1(f) prohibits such a sentence.

## C. *Legislative History*

Because our ultimate goal is to effectuate the Legislature's intent, we consider whether any legislative history provides insight into the Legislature's intent as to which statute prevails. (*Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1064 [123 Cal.Rptr.3d 395] (*Turner*).) Section 12022.53(e)(2) and section 1170.1(f) were enacted nearly

simultaneously during the Legislature's 1997–1998 Regular Session. The Legislature approved Assembly Bill No. 4 (1997–1998 Reg. Sess.) (hereafter Assembly Bill No. 4), including section 12022.53(e)(2), on September 13, 1997, and the Governor approved it on September 25, 1997. (Stats. 1997, ch. 503, § 3, p. 3135.) The Legislature approved Senate Bill No. 721 (1997–1998 Reg. Sess.) (hereafter Senate Bill No. 721), including section 1170.1(f), on September 12, 1997, and the Governor approved it on October 7, 1997. (Stats. 1997, ch. 750, § 3, p. 5060.)

█ Neither bill's legislative history refers to the other, much less addresses the conflict between section 12022.53(e)(2) and section 1170.1(f). Assembly Bill No. 4 enacted section 12022.53, specifying a range of different enhancements for the use of firearms in the commission of offenses. In an uncodified preamble, the Legislature found and declared "that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." (Stats. 1997, ch. 503, § 1, p. 3135; see also *People v. Palacios* (2007) 41 Cal.4th 720, 730 [62 Cal.Rptr.3d 145, 161 P.3d 519] (*Palacios*).) Senate Bill No. 721 revised various aspects of the California sentencing scheme; it amended five sections, added a new section, and repealed another section. (Stats. 1997, ch. 750, p. 5060.) The final Senate Rules Committee analysis explained that the bill "would simplify California's consecutive sentencing scheme and remove several of the caps and limitations on imposing consecutive sentences." (Sen. Rules Com., Unfinished Business Analysis of Sen. Bill No. 721 (1997–1998 Reg. Sess.) as amended Sept. 5, 1997, p. 2.) The Legislative Counsel's Digest makes clear that section 1170.1(f) did not, as relevant in the present case, make a substantive change in the law. The digest explained that under both existing law and Senate Bill No. 721, when multiple enhancements relating to firearms are applicable, only the greatest one shall be imposed. (Legis. Counsel's Dig., Sen. Bill No. 721 (1997–1998 Reg. Sess.) 6 Stats. 1997, Summary Dig., p. 336.) Based on our review, we conclude that, although section 12022.53(e)(2) and section 1170.1(f) are consistent with the goals of the larger enactments of which they are parts, the legislative history to the enactments provides no specific guidance regarding which provision should prevail in the event of a conflict like that in this case.

D. *Section 12022.53(e)(2), the More Specific Statute, Prevails*

In resolving the statutory conflict, the most significant factor is that section 12022.53(e)(2) is the more specific of the two statutes, because it specifically addresses the two enhancements at issue in this case, whereas section 1170.1(f) relates to firearm enhancements generally. Indeed, section 12022.53, subdivision (f) actually provides that the section 12022.53 firearm enhancement shall not be imposed in addition to firearm enhancements under six

specified other sections.[37] Accordingly, not only is section 12022.53(e)(2) more specific regarding the application of the two enhancements at issue in this case, but section 12022.53, subdivision (f) is more specific than section 1170.1(f) on the issue of when the section 12022.53 firearm enhancement may not be imposed in addition to other firearm enhancements.

■■■ "[W]here there is a conflict between a general statute and a more specific one, the specific statute controls and will be treated as an exception to the general statute. [Citation.] As courts have explained, ' "Unless repealed expressly or by necessary implication, a special statute dealing with a particular subject constitutes an exception so as to control and take precedence over a conflicting general statute on the same subject. [Citations.] This is the case regardless of whether the special provision is enacted before or after the general one [citation], and notwithstanding that the general provision, standing alone, would be broad enough to include the subject to which the more particular one relates." [Citation.]' [Citations.]" (*Turner, supra*, 193 Cal.App.4th at p. 1065; see also *Salazar v. Eastin* (1995) 9 Cal.4th 836, 857 [39 Cal.Rptr.2d 21, 890 P.2d 43] ["To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute. [Citations.]"].) The decision in *People v. Powell* (1991) 230 Cal.App.3d 438, 441 [281 Cal.Rptr. 568], employed this principle of statutory interpretation in concluding that "the specific legislative intent to impose additional punishment for certain drug offenses, expressly stated in [Health and Safety Code] section 11370.2, prevails over the general legislative intent against double punishment expressed in Penal Code section 654." (See also *Palacios, supra*, 41 Cal.4th at p. 730.)

Although the decision did not rely on the principle that the more specific statute prevails, *People v. Pieters* (1991) 52 Cal.3d 894 [276 Cal.Rptr. 918, 802 P.2d 420] is also instructive. There, the Supreme Court found a three-year enhancement for cocaine offenses involving more than 10 pounds of the drug was impliedly excepted from a section of the Penal Code that limited prison terms to double the base term (former § 1170.1, subd. (g)). (*Pieters*, at p. 904.) The court explained that limiting the enhancement by the general rule would undermine the "manifest intention" of the Legislature that dealers in large quantities of drugs should be more severely punished. (*Id.* at p. 901.) The court concluded the omission of an express exception was an instance of " 'draft[er's] oversight,' " and characterized the new enhancement as an implied exception to the general sentencing law. (*Id.* at p. 902 & fn. 5; see also *People v. Jackson* (1985) 37 Cal.3d 826, 838 [210 Cal.Rptr. 623, 694 P.2d

---

[37] Section 12022.53, subdivision (f) provides in relevant part: "An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section."

736] ["we read" former § 1170.1, subd. (g) "as if it contained an exception for enhancements for serious felonies pursuant to" former § 667], disapproved on other grounds in *People v. Guerrero* (1988) 44 Cal.3d 343, 348 [243 Cal.Rptr. 688, 748 P.2d 1150].) In the present case, treating section 12022.53(e)(2) as an exception to section 1170.1(f) is consistent with the Legislature's intent to impose enhanced punishment on those who *personally* use firearms in gang-related felonies. (*Brookfield, supra,* 47 Cal.4th at pp. 593–594; *Palacios, supra,* 41 Cal.4th at pp. 725, 733; *People v. Oates* (2004) 32 Cal.4th 1048, 1057–1058 [12 Cal.Rptr.3d 325, 88 P.3d 56].)[38]

In conclusion, because section 12022.53(e)(2) specifically authorizes the imposition of both the section 12022.53(b) and the section 186.22(b)(1)(C) enhancements in the circumstances of this case, the trial court erred in staying the section 186.22(b)(1)(C) enhancement under the reasoning of *Rodriguez, supra,* 47 Cal.4th 501, which did not consider statutory language analogous to section 12022.53(e)(2).[39] The proper remedy is to reverse the trial court's judgment and remand the matter for resentencing, which will give the trial court an opportunity to restructure its sentencing choices in light of our decision. (*Rodriguez,* at p. 509.)

---

[38] Enactment of Assembly Bill No. 4 indisputably was motivated by a desire to severely punish those who use firearms. An Assembly Committee on Public Safety analysis provided the following author's statement: "According to the author, 'For far too long, criminals have been using guns to prey on their victims. . . . The problem is not guns, the problem is gun violence . . . [,] criminals misusing guns to terrorize, injure and kill their victims . . . . With the Three Strikes law, the voters sent a clear message to criminals. With the 10–20-life provisions of [Assembly Bill No. 4], we are sending another clear message: If you use a gun to commit a crime, you're going to jail, and you're staying there.'" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 4 (1997–1998 Reg. Sess.) as amended Apr. 9, 1997, pp. 2–3.)

[39] This conclusion finds support in the *Palacios* decision. There, the Supreme Court held that section 654 does not bar punishment for more than one firearm use enhancement under section 12022.53, subdivision (d). (*Palacios, supra,* 41 Cal.4th at p. 723.) The court reasoned that the Legislature's use of the words " ' "[n]otwithstanding any other provision of law" ' " in the section 12022.53, subdivision (d) enhancement made that section an express exception to the application of section 654, despite the absence of a specific reference to section 654. (*Palacios,* at pp. 729–730.) Arguably, the Legislature's use of the same phrase, "[n]otwithstanding any other provision of law," in section 12022.53(b) made that section an exception to the application of section 1170.1(f). However, we need not reach that issue in light of our conclusion that section 12022.53(e)(2) expressly authorized imposition of the two enhancements in the present case.

Defendant also contends that section 654 prohibits the imposition of both enhancements. We reject that contention for the same reason that we reject defendant's argument based on section 1170.1(f). That is, even assuming that section 654 prohibits the imposition of both enhancements, we conclude that section 12022.53(e)(2), which is more specific, must be treated as an exception to section 654. (See *Rodriguez, supra,* 47 Cal.4th at p. 507.)

V. *The Sentence for Gang Participation Must Be Stayed Under Section 654**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's judgment is reversed as to the sentence imposed, and affirmed in all other respects. The matter is remanded for resentencing. In resentencing defendant, any sentence imposed for his conviction under section 186.22(a) must be stayed pursuant to section 654.

Jones, P. J., and Needham, J., concurred.

The petition of appellant Carlos Robinson for review by the Supreme Court was denied November 14, 2012, S205447.

---

*See footnote, *ante*, page 232.