Filed 3/13/13  P. v. Vinson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TOM LOVE VINSON,<br><br>    Defendant and Appellant. | B238043<br><br>(Los Angeles County<br>Super. Ct. No. NA083837) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed with directions.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

# INTRODUCTION

Defendant Tom Love Vinson appeals from a judgment of conviction entered after a jury found him guilty of one count of first degree murder (Pen. Code, § 187, subd. (a); count 1), two counts of attempted willful, deliberate and premeditated murder (*id*., §§ 187, subd. (a), 664; counts 2 and 3), and one count of attempted voluntary manslaughter (*id*., §§ 192, subd. (a), 664; count 4). The jury found true the allegations defendant personally and intentionally discharged a firearm, causing great bodily injury on the victims (*id*., § 12022.53, subds. (b), (c) & (d)), and the crimes were committed for the benefit of a criminal street gang (*id*., § 186.22, subd. (b)(1)(C)). The jury also found true the allegation that in the commission of the voluntary manslaughter, defendant personally used a firearm (*id*., § 12022.5, subd. (a)). The trial court sentenced defendant to 130 years to life, plus a determinate term of 25 years and six months.

On appeal, defendant challenges his conviction of attempted voluntary manslaughter and his sentence. We affirm the convictions but remand for resentencing.

# FACTS

**A.** *Prosecution*

On the evening of October 30, 2009, a homecoming football game was held at Wilson High School in Long Beach. After the game, the crowd of spectators was leaving the school. Cheerleaders Melody Ross (Ross) and Tori R. were sitting on the curb. Marcus Moore (Moore) and Brad Van (Van), who were members of the Rolling Twenties Crips gang, were standing nearby.

Defendant, Nicholas Campbell (Campbell), and Davion Davis (Davis) approached the four. Defendant and Campbell were members of the Baby Insane clique of the Insane Crips gang, and Davis was an associate of the gang. The Insane Crips and Rolling Twenties Crips are rivals.

2

As defendant and his group passed the other group, they exchanged words. Defendant and Campbell both said "Babies." Moore and someone else responded, "Twenties." Defendant took out a .25 caliber handgun and fired it four times in Moore's direction, killing Ross and wounding Moore and Van.[1]

People near the groups heard some of the exchange, including the words "Rolling," "Twenties or Twenty Crips," and "Babies." Some heard derogatory terms for the two gangs used, and some witnesses described the exchange as "banging" on one another.

Brittney R. heard people "banging" on each other but did not remember specifically what they said. She saw defendant pointing his gun "like almost towards" her, and when he started shooting, she dropped to the ground.[2]

According to Moore, as defendant's group walked by, someone said "Babies," and someone responded "Twenties." Moore also said "Twenties." Then defendant shot him in the arm and the leg.

Moore knew defendant and admitted throwing Rolling Twenties hand signs at him in the past, but not on the night of the shooting. Moore also admitted that he was armed with a concealed, loaded handgun at the time, so he could shoot someone if he needed to. He denied drawing it out that night and said he gave it to Van after the shooting.

Long Beach Police Officer Chris Zamora testified as a gang expert. He explained that Wilson High separates Rolling Twenties Crips territory from Baby Insane Crips territory. He discussed the two gangs and the significance of the interchange prior to the shooting. In his opinion, the crime was committed for the benefit of the gang and the shooter.

---

[1] Defendant was convicted of the murder of Ross, attempted murder of Van and Moore, and attempted voluntary manslaughter of Tori R.

[2] Defendant was acquitted of the attempted murder of Brittney R.

**B.** *Defense*

Defendant testified that he was 16 years old at the time of the shooting. He had been a member of the Rolling Twenties before switching to the Insane Babies with a friend of his. A person can be killed for switching gangs, and his friend was killed at age 15.

Defendant carried a gun because he was always in fear for his life. The Rolling Twenties had shot at him about 20 times and had beaten him up for switching gangs. Defendant had never in the past shot back, because he always had been taken by surprise. He did not report the shootings to the police, because his gang would have killed him if he did.

While defendant was at the football game, some members of the Rolling Twenties saw him. They threw gang signs, shouted slogans, revealed guns and challenged him to go outside the school grounds. Defendant did not accept the challenge but showed the people he was with that he had a gun.

When the game was ending, defendant was outside the school with some friends. Campbell and Davis came over, and the three decided to walk to a restaurant. As they were walking, he saw Moore and Van with some other members of the Rolling Twenties. Defendant knew them from his days with the Rolling Twenties, and he and Van used to be good friends. He and Van still respected one another, but Moore was usually antagonistic towards him.

As defendant walked past Van, he did not acknowledge him, since defendant was with fellow gang members. Defendant heard someone say "Twenties" and someone else say "Babies." Defendant turned around. He heard someone make a derogatory comment about the Insane Babies, and then he saw Van reaching into his waistband for a gun. Campbell made a derogatory comment about the Rolling Twenties, and Van started to raise his gun in defendant's direction. Defendant drew his gun and started shooting at Van's arm; he thought Van was going to kill him.

Defendant did not aim at Ross or intend to kill her. He did not tell the police that Van drew a gun on him because he did not trust the police and he did not want to be a snitch.

According to defendant's friend, Matthew Vaughn, at a previous football game members of the Rolling Twenties threw gang signs, yelled gang slogans and brandished guns at defendant.

Long Beach Police Officer Malcolm Evans told Moore that he could be held liable for having a gun before Moore denied brandishing a gun. Officer Evans acknowledged that neither Moore nor Van was charged with possession of a concealed weapon, even though both admitted they had committed that crime. When Officer Evans interviewed defendant, defendant did not cooperate. Defendant did not claim self-defense.

## C. *Rebuttal*

Davis testified that he was walking with defendant and Campbell when he saw a member of the Rolling Twenties who looked to be under the influence of drugs. The man looked angry and had his jaw clenched. His hands were at his waistband under his shirt, and he was swaying.

Campbell told Davis that the man was a member of the Rolling Twenties who had "banged" on him a couple of days earlier. Campbell uttered a gang slogan for the Insane Babies. The man said "Twenty Crips" and made a derogatory comment about the Insane Babies.

Defendant then turned around and made a derogatory comment about the Rolling Twenties. The man returned the comment about the Insane Babies "and all your dead homies." This was disrespectful, especially since defendant's friend had been killed by the Rolling Twenties. Defendant repeated his comment and started shooting.

Davis did not see the drugged man's hands leave his waistband, and he did not see anyone in the crowd with a gun. Davis had a gun, but he did not draw it.

After the shooting, defendant told Davis that he would get killed if he snitched. Davis could have been sentenced to 100 years to life as a codefendant in this case, but he

pled guilty in exchange for an eight-year sentence, with part of his sentence served in a juvenile facility.

## DISCUSSION

### A. *Jury Confusion Regarding Transferred Intent*

Defendant contends the trial court's failure to resolve the jury's confusion regarding the interplay of transferred intent and the intent required for murder, attempted murder, and their lesser included offenses requires reversal of his conviction of attempted voluntary manslaughter. We disagree.

During deliberations, the jury sent in a request reading: "Clear of 'intent' as to the following [¶] 1. Murder [¶] 2. Attempt murder [¶] 3. Voluntary manslaughter [¶] 4. Attempted voluntary manslaughter." The court asked counsel if they had any suggestions. Defense counsel said he did not. The prosecutor recommended that the court "point them to the eight series, which is all the crimes that you just read off." The court said it would read CALJIC No. 3.31[3] "and tell them that the eight series contains all the definitions of intent for murder, attempted murder, voluntary manslaughter, attempted voluntary manslaughter."

Defense counsel then responded, "Your Honor, if we are going to essentially say we are not going to give you anymore definitions or clarify anything other than what you have got in the jury instructions, and let's just bite the bullet and tell them that." The prosecutor said he did not understand how that was any different than what the court stated it would do. The court said that defense counsel "is basically saying tell them that all the instructions have been provided. And I don't really want to do that. I think we need to provide a response." The court added that it was thinking about reopening argument to allow the attorneys to argue the issue of intent. The prosecutor suggested

---

[3] CALJIC No. 3.31 addresses the concurrence of act and specific intent.

that they give the jurors "an opportunity to view the instructions again and . . . maybe they can fine tune their actual request."

The court then reread CALJIC No. 3.31 and directed the jury to the instructions in the eight series. The court added that if the jury had any other questions, they could write them down and the court would address them.

Later that day, the jury requested "[c]larification of 'transfer of intent'?" The trial court stated that it would "just read them [CALJIC No.] 8.65 and Special Instruction One. [CALJIC No.] 8.65 is a transferred intent. Special Instruction One is the reverse of transferred intent."[4] The court asked if counsel had any questions or objections, and both answered no.

The court later suggested: "The only thing that I might add to [CALJIC No.] 8.65 is that 8.65 transferred intent only applies to count one, charge of murder, or voluntary manslaughter. They might be confused about the other counts." The prosecutor agreed that transferred intent applied only to the murder. Defense counsel requested that the court also "clarify that reverse transferred intent applies to all of the charges." He also mentioned the "kill zone" theory with respect to self-defense. The prosecutor responded that self-defense was another issue; the jury was asking about transferred intent, which only applied to the murder of Ross.

The trial court reread CALJIC No. 8.65 and Special Instruction 1 to the jury. It added: "Transferred intent only applies to count one, charge of murder, or the lesser included offense of voluntary manslaughter."

---

[4]    CALJIC No. 8.65 reads: "When one attempts to kill a certain person, but by mistake or inadvertence kills a different person, the crime, if any, so committed is the same as though the person originally intended to be killed, had been killed." Special Instruction 1 read: "Under the doctrine of transferred intent, just as one's criminal intent follows the corresponding criminal act to its unintended consequences, so too does one's lack of criminal intent follow the corresponding noncriminal act to its unintended consequences. Thus, a defendant is guilty of no crime if his legitimate act in self-defense results in the inadvertent death of an innocent bystander."

As defendant sees it, the only way the jury could have convicted him of the attempted voluntary manslaughter of Tori R. was if they misunderstood the concept of transferred intent. He was convicted of the attempted murder of Moore and Van because they were rival gang members who he intended to kill. He was convicted of the murder of Ross because of transferred intent. But in order to be convicted of the attempted voluntary manslaughter of Tori R., defendant either had to intend to kill her, or her killing was without malice due to provocation or imperfect self-defense. Since the jury did not find provocation or imperfect self-defense with respect to the other victims, defendant reasons, his conviction of attempted voluntary manslaughter could only be the result of a misunderstanding of the concept of transferred intent.

Defendant argues that the record "shows that the trial court's responses did not clear up the jurors' confusion" as to the concept of transferred intent. The responses were inadequate, in that "[t]here is no point in reiterating language which has failed to enlighten the jury." (*People v. McDowell* (1988) 46 Cal.3d 551, 581, conc. & dis. opn. of Broussard, J.) Defendant claims that therefore, this court can have no confidence in the jury's verdict as to Tori R., and his conviction of attempted voluntary manslaughter must be reversed. (See *White v. Illinois* (1992) 502 U.S. 346, 363-364 [112 S.Ct. 736, 116 L.Ed.2d 848] ["Reliability is . . . a due process concern."].)

The People claim there is another possible explanation for the jury's verdict: The jury was instructed on the concept of concurrent intent pursuant to CALJIC No. 8.66.1: "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you." Under the "kill zone" theory, defendant could have had the intent to kill Tori R. but had no malice toward her, hence the conviction of attempted voluntary manslaughter.

8

Additionally, the People claim, even if the verdict as to attempted voluntary manslaughter was inconsistent with the verdicts on the other counts, that does not provide a basis for reversing the conviction. "As a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.]" (*People v. Avila* (2006) 38 Cal.4th 491, 600.) As explained in *People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, "'[t]he law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence.' [Citation.]" (*Id.* at p. 13.) Even where the verdicts are inconsistent, the "'"defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts."'" (*Ibid.*) So long as there is sufficient evidence to support the defendant's conviction beyond a reasonable doubt, no "'"further safeguards against jury irrationality are necessary."'" (*Ibid.*)

Here, we are unconvinced that the record affirmatively shows that the trial court's responses to the jury's questions did not clear up their confusion. The jury first asked a general question regarding intent. It then asked a specific question regarding the concept of transferred intent. It asked no further questions on the matter, and there is nothing to show that the jury gave up on getting its questions answered rather than received the guidance it needed to apply the instructions it had received.

Moreover, defendant does not challenge the sufficiency of the evidence to support his conviction of the attempted voluntary manslaughter of Tori R., and there is a basis upon which the jury could have convicted him of that offense. Therefore, any inconsistency in the verdicts does not warrant reversal of his conviction. (*People v. Superior Court (Sparks)*, *supra*, 48 Cal.4th at p. 13.)

**B. *Imposition of the Gang Enhancement***

The jury found the gang allegations (Pen. Code, § 186.22, subd. (b)(1)(C)) to be true as to all four counts. In sentencing defendant, the trial court stayed the gang enhancement as to count 1, murder. As to counts 2 and 3, attempted murder, the court

imposed a 15-year minimum term "pursuant to the gang enhancement allegation."  As to count 4, attempted voluntary manslaughter, the court did not mention the gang enhancement.  The abstract of judgment, however, reflects a 10-year enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C).

It is the trial court's oral pronouncement of judgment and sentence which constitutes the judgment in a criminal case.  (*People v. Mesa* (1975) 14 Cal.3d 466, 471; 6 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Judgment, § 146, p. 172.)  The abstract of judgment is not the judgment and is not controlling.  (*Mesa*, *supra*, at p. 471.)  Defendant therefore requests that we strike the 10-year gang enhancement from the abstract of judgment.

As the People point out, subdivision (g) of Penal Code section 186.22 provides in pertinent part:  "Notwithstanding any other law, the court may strike the additional punishment for the enhancements provided in this section . . . in an unusual case where the interests of justice would best be served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition."  Imposition of the gang enhancements is thus mandatory unless the trial court strikes the enhancements under subdivision (g).  Therefore, the trial court was not authorized to stay the gang enhancement as to court 1 or fail to impose it as to count 4.  (*People v. Robinson* (2012) 208 Cal.App.4th 232, 261; *People v. Campos* (2011) 196 Cal.App.4th 438, 446-447 [sentence which deviates from the requirements of Penal Code section 186.22, subdivision (b), is unauthorized].)

The matter must be remanded for resentencing "which will give the trial court an opportunity to restructure its sentencing choices in light of our decision."  (*People v. Robinson*, *supra*, 208 Cal.App.4th at p. 261.)

## C.  *Imposition of Upper Term on Count 4*

Defendant contends there is insufficient evidence to support the aggravating factors which the trial court used to impose the upper terms on defendant's sentence and the gun use enhancement on count 4.  The aggravating factors cited by the court were that

the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)) and the crime involved the threat of great bodily harm (*id*., rule 4.421(a)(3)).

The trial court has broad discretion in weighing the aggravating and mitigating factors and selecting a sentence. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847; *People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) Its sentence must be affirmed absent a clear showing of abuse. (See *Avalos*, *supra*, at p. 1582.) Discretion is abused if the selection is arbitrary or capricious or exceeds the bounds of reason under the circumstances. (*Sandoval*, *supra*, at p. 847; *People v. Welch* (1993) 5 Cal.4th 228, 234.)

A particularly vulnerable victim is one who is vulnerable "'in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act.'" (*People v. Huber* (1986) 181 Cal.App.3d 601, 629.) Tori R. was sitting on the sidewalk, talking with Ross. She heard gunshots coming from behind her. By the time she was able to get up and get behind a van for protection, the shooting was over and Ross was dead. Tori R. was "'defenseless, unguarded, unprotected, accessible, assailable'" (*ibid*.); there was nothing she could have done to protect herself and she could have been the victim just as easily as Ross. Tori R. therefore was particularly vulnerable. (See, e.g., *People v. Webber* (1991) 228 Cal.App.3d 1146, 1170.)

As to the threat of great bodily harm, defendant suggests that because "there are so many firearm-based attempted homicides in this state—gang-related or not—that occur in a public setting and place victims such as [Tori R.] at risk of the ultimate harm[, t]here is nothing distinctive about this case that sets it apart from the typical case where these elements and enhancements come into play." Defendant's analysis is faulty.

An aggravating factor is one which "makes defendant's conduct distinctively worse than it would otherwise have been." (*People v. Zamarron* (1994) 30 Cal.App.4th 865, 872; *People v. Fernandez* (1990) 226 Cal.App.3d 669, 680.) Shooting into a crowd of people—as opposed to shooting at the intended victim without risking hitting an innocent bystander—makes defendant's conduct worse than it otherwise would have been. (See *People v. Steele* (2000) 83 Cal.App.4th 212, 227 [threatening to shoot at the

victim's apartment building created a threat of great bodily harm to persons other than the victim and thus was an appropriate aggravating factor].)

Both aggravating factors were appropriately employed here. Thus, the trial court did not abuse its discretion in imposing the upper term on count 4.

## D. *Cruel and Unusual Punishment*

Defendant contends that imposition of the "functional equivalent" of a term of life without the possibility of parole (*People v. Caballero* (2012) 55 Cal.4th 262, 268) for a crime committed when he was 16 years old constitutes cruel and unusual punishment. We agree the case must be remanded for resentencing to enable the trial court to reconsider its sentence in light of recent case law.

In *People v. Murray* (2012) 203 Cal.App.4th 277, review denied April 11, 2012, Division Eight of this court addressed the constitutionality of a sentence of life without parole for juvenile murderers. The court began its analysis with *Graham v. Florida* (2010) 560 U.S. ___ [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), in which "the United States Supreme Court announced a categorical rule prohibiting no-parole life sentences for minors who were convicted of nonhomicide offenses. *Graham*'s holding was based on the following: (1) scientific studies showing fundamental differences between the brains of juveniles and adults; (2) a juvenile's capacity for change as he matures, which shows that his crimes are less likely the result of an inalterably depraved character; (3) the notion that it is morally misguided to equate a minor's failings with those of an adult; and (4) the fact that even though nonhomicide crimes may have devastating effects, they cannot be compared to murder in terms of severity and irrevocability. [Citation.]" (*Murray*, *supra*, at pp. 282-283.)

The defendant wanted the court to "extend *Graham* and hold that no-parole life sentences for juvenile offenders who commit murder categorically violate" the state and federal proscriptions against cruel and unusual punishment. (*People v. Murray*, *supra*, 203 Cal.App.4th at p. 283.) The court declined to do so. (*Ibid*.) It noted that in the

recent case of *People v. Blackwell* (2011) 202 Cal.App.4th 144,[5] "the First District considered the same argument in the case of a 17 year old who had been convicted of first degree murder during an attempted robbery inside the victim's home. The *Blackwell* court concluded that *Graham's* rationale did not apply because *Graham*'s holding was expressly limited to juveniles convicted of nonhomicide offenses. (*Blackwell*, at p. 156.) This held true, the *Blackwell* court concluded, even if, as the defendant contended, he had been convicted as an aider and abettor because (1) juveniles convicted of murder cannot be compared to those who commit lesser offenses and (2) the jury must have found that the defendant either intended to kill, or was a major participant in the underlying felony and acted with reckless indifference to human life. (*Id*. at p. 157.)" (*Murray*, *supra*, at p. 283.)

The *Murray* court agreed with *Blackwell*'s logic, noting that "[t]he *Graham* court recognized that its rule made sense because 'defendants who do not kill, intend to kill or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers.' [Citation.] In *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183] (*Roper*), the Supreme Court established a categorical prohibition against capital punishment for juveniles convicted of homicide. In dismissing the penological justification for the death penalty in such cases, the *Roper* court said, 'it is worth noting that the punishment of life imprisonment without the possibility of parole is itself a severe sanction, in particular for a young person.' [Citation.] As Chief Justice Roberts noted in his concurring opinion in *Graham*, '*Roper* explicitly relied on the possible imposition of life without parole on some juvenile offenders.' (*Graham*, *supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2039] (conc. opn. of Roberts, C. J.).) And, as Justice Thomas pointed out in his dissent, the *Graham* majority held that a life without parole

---

[5]     Although review was denied in *Blackwell* on March 14, 2012, the United States Supreme Court recently granted certiorari in the case and vacated the judgment on January 7, 2013 (*Blackwell v. California* (2013) ___ U.S. ___ [133 S.Ct. 837, 184 L.Ed.2d 646]).

sentence on a minor was cruel and unusual punishment 'unless he has committed a homicide.' (*Id*. at p. ___ [130 S.Ct. at p. 2043] (dis. opn. of Thomas, J.).) Taken together, these statements strongly suggest that to the United States Supreme Court, a no-parole life sentence for juvenile murderers does not violate the Eighth Amendment['s proscription against cruel and unusual punishment]. [Citation.]" (*People v. Murray*, *supra*, 203 Cal.App.4th at pp. 283-284, fn. omitted.)

Having concluded that *Graham* did not extend to juvenile murderers, the court in *Murray* then turned to the question whether the defendant's sentence of life without the possibility of parole "was unconstitutional because it was disproportionate when the nature of his crimes [was] measured against various mitigating circumstances. These mitigating circumstances include[d] his youth; his lack of a prior criminal record; and . . . his true remorse for what he had done and his excellent behavior while in prison." (*People v. Murray*, *supra*, 203 Cal.App.4th at p. 284.) The court concluded that even considering these mitigating circumstances, the nature of his offense was such that a sentence of life without the possibility of parole was not disproportionate and hence not unconstitutional. (*Id*. at p. 285.)

After the decision in *Murray*, the United States Supreme Court decided *Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*). In *Miller*, "[t]he two 14-year-old offenders in these cases were convicted of murder and sentenced to life imprisonment without the possibility of parole. In neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate. Such a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' [*Graham*, *supra*, 560 U.S. at pp. ___, ___ [130 S.Ct. at pp. 2026-2027, 2029-2030], and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties. [The court] therefore h[e]ld that mandatory life without parole for those under the age of 18 at the

time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, at p. ___ [132 S.Ct. at p. 2460].)

The court noted that in its cases dealing with claims of cruel and unusual punishment, it had stressed that the punishment should be proportionate to the crime and the offender's culpability. (*Miller*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at pp. 2463-2464].) Imposition of mandatory life sentences on juvenile offenders without consideration of the nature of their crimes or their level of culpability violated these precepts and thus the Eighth Amendment. (*Id.* at p. ___ [132 S.Ct. at p. 2466].) The court did not ban imposition of a sentence of life without parole on a juvenile offender, but it did require sentencing courts to consider the differences between children and adults, "and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. ___ [132 S.Ct. at p. 2469], fn. omitted.)

*Murray* is consistent with *Miller* in its conclusion that the Eighth Amendment does not categorically prohibit a sentence of life without the possibility of parole for a juvenile murderer. (*People v. Murray*, *supra*, 203 Cal.App.4th at pp. 283-284.) What is required before imposing such a sentence, however, is that the court consider the defendant's age and the differences between a juvenile and an adult, and whether the sentence is appropriate in light of those factors. (*Id.* at p. 284; accord, *Miller*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2469].)

In light of the foregoing, we reject defendant's contention that his sentence is unconstitutional on its face. The question then is whether the sentence "was unconstitutional because it was disproportionate when the nature of his crimes is measured against various mitigating circumstances." (*People v. Murray*, *supra*, 203 Cal.App.4th at p. 284.)

Defendant acknowledges that his "offense was odious. The jurors found he shot and killed Ross while trying deliberately to kill Moore and Van." He also acknowledges "[t]he offense and its circumstances merited severe punishment." He argues, however, that "those circumstances when combined with [his] individual culpability are not so opprobrious as to merit a term of death in custody."

15

Relying on the statement in *Miller* "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon" (*Miller*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2469]), defendant argues that "[t]here is nothing about the circumstances of [defendant] or his offense that merits the constitutionally 'uncommon' term of death in custody." He jumps back to his argument that gang-related murders by juveniles are so common, that there is nothing about this case which "jump[s] out as somehow uncommon from those other offenders who grew up in a gang culture." He adds that he was provoked by the victims, who made derogatory comments about his friend who was killed by the victims' gang after defendant and his friend switched gangs.

We refuse to accept the notion that gang-related murders by juveniles are so common that we as a society should not impose the harshest penalties on those who commit such murders. We also refuse to accept defendant's claim that he is less culpable because he was provoked by two of the victims who struck at his heart by expressing their contempt for his dead friend.

Defendant went to a high school football game where, in the past, members of the Rolling Twenties threw gang signs, yelled gang slogans and brandished guns at him. At the game, members of the Rolling Twenties repeated this behavior and challenged him to go outside, but stayed there and showed them that he had a gun with him.

After the game, defendant and his friends decided to go get something to eat. Defendant saw Moore and Van, whom he knew to be members of the Rolling Twenties, with other members of that gang. While defendant and Van respected one another, defendant knew that Moore was usually antagonistic towards him. Defendant nonetheless walked past the group of rival gang members. It was at that point that there was a verbal interchange, followed by defendant shooting at Moore and Van.

It is reasonably inferable that defendant deliberately placed himself in a position to have a confrontation with Moore and Van and the other members of a rival gang. That the confrontation he provoked resulted in hurtful comments hardly supports a finding that he was less culpable for his actions.

16

This was not defendant's first brush with the law, although it was by far the most serious. He had a sustained petition for receiving stolen property when he was 13 years old. He was given voluntary probation and the petition was dismissed after completion of probation. Two years later, he had two sustained petitions for burglary and he was again ordered home on probation. He committed the instant crimes while on probation.

In *People v. Dillon* (1983) 34 Cal.3d 441, the California Supreme Court found punishment for first degree murder constituted cruel and unusual punishment where the defendant was an unusually immature 17-year-old, in no prior trouble with the law, who shot the victim in response to a suddenly developing situation which he perceived as threatening to his own life; while defendant largely created the threatening situation, his immaturity prevented him from seeing the risk he created or from extricating himself from the situation without panicking. (*Id.* at p. 488.)

Here, by contrast, there is no evidence that defendant was unusually immature. He did not shoot in panic to defend himself; the jury found the murders were willful, deliberate and premeditated. He had a history of gang involvement and criminal behavior and was on probation at the time of the crimes. The court would be justified in concluding that "[d]efendant has proven himself to be completely resistant to the rules and structures of civilized society and the criminal justice system . . . . The danger he presents to society is significant. Defendant committed this crime, not because he was in the wrong place at the wrong time" or because he was unforeseeably provoked, "but because he has a complete disregard for the rule of law and lack of respect for human life." (*People v. Em* (2009) 171 Cal.App.4th 964, 976.)

However, we believe that before any conclusion is reached, the trial court should consider the mitigating factors discussed in *Miller*, namely the differences between juveniles and adults, "and how those differences counsel against irrevocably sentencing [a juvenile] to a lifetime in prison." (*Miller*, *supra*, ___ U.S. at p. ___ [132 S.Ct. at p. 2469], fn. omitted.) Before sentencing defendant to what amounts to life in prison without the possibility of parole, the trial court must consider the defendant's age, the differences between a juvenile and an adult, and whether the sentence is appropriate in

17

light of those factors.  (*People v. Murray*, *supra*, 203 Cal.App.4th at p. 284; accord, *Miller*, *supra*, at p. ___ [132 S.Ct. at p. 2469].)  It therefore is appropriate that on remand, the trial court reconsider the entire sentence imposed and whether, in light of *Miller*, that sentence is appropriate.[6]

## DISPOSITION

The judgment of conviction is affirmed.  The case is remanded for resentencing consistent with the views expressed herein.

JACKSON, J.

We concur:

PERLUSS, P. J.

ZELON, J.

---

[6]     We note that this case is distinguishable from two recent cases cited by defendant. In *People v. Moffett* (2012) 209 Cal.App.4th 1465, review granted January 3, 2013, No. S206771, a juvenile's sentence of life without the possibility of parole for first degree felony murder was remanded for resentencing in light of *Miller*.  In *Moffett*, the defendant's accomplice killed the victim, and there was no evidence that defendant had the intent to kill the victim.  (*Moffet*, *supra*, at p. 1478.)  Similarly, in *People v. Argeta* (2012) 210 Cal.App.4th 1478, review denied February 20, 2013, the case of the codefendant, who was convicted of homicide only as an aider and abettor, was remanded for reconsideration of his sentence in light of *Miller*.  (*Argeta*, *supra*, at pp. 1480, 1483.)