Filed 11/13/13  P. v. Babczenko CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B244815 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA 084129) |
| v. | |
| PETER BABCZENKO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stan Blumenfeld, Judge.  Affirmed.

D. Inder Comar, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Victoria B. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

A jury convicted appellant Peter Babczenko of one count of possession of a controlled substance for sale. (Health & Saf. Code, § 11378.) The trial court suspended the imposition of sentence and placed appellant on probation for three years. Appellant contends we must reverse his conviction because (1) evidence obtained from a search of his home was the fruit of an illegal cell phone search, and (2) the admission of text messages from his cell phone violated his confrontation clause rights. We reject both arguments and affirm.

## FACTS AND PROCEDURE

### 1. *Preliminary Hearing and Motion to Suppress*

Before his arraignment, appellant filed a motion to suppress and motion to quash the search warrant. Appellant sought "an order suppressing all evidence seized by law enforcement during his arrest on August 9, 2011." He argued his "vehicle was stopped by the Los Angeles Sheriff's Department without a search or arrest warrant and without probable cause. As a result of this unlawful detention and subsequent illegal vehicle search, items of contraband were allegedly seized which caused the deputies to obtain a search warrant for Defendant's residence . . . ."

The following evidence was adduced at the preliminary hearing. Deputy Eduardo Ayala of the Los Angeles County Sheriff's Department conducted a traffic stop of appellant at approximately 10:00 a.m. on August 9, 2011. He stopped appellant in front of his home for failure to stop at a four-way stop sign. When Deputy Ayala was still in his patrol car and behind appellant's car, he saw appellant reach toward the floorboard of the driver's side. Appellant immediately exited his car when he stopped. Deputy Ayala ordered him to get back in the car, after which he and Sergeant Stacy Morgan approached and spoke with appellant and appellant's passenger, Eric Neiman. They ordered appellant and Neiman to exit the car. As appellant was exiting, Deputy Ayala saw a vial on the driver's side floorboard. The officers handcuffed appellant and Neiman, put them in the patrol vehicle, and searched appellant's car. Deputy Ayala retrieved the vial and found a yellow pill inside. He

called poison control and related the numbers or markings on the pill and gave a description of the pill. Poison control told him the pill was a "schedule three narcotic," hydrocodone. Deputy Ayala arrested appellant for possession of a controlled substance.

The prosecution also called Deputy Rick Adams, who was involved in the investigation at the scene of appellant's arrest. He arrived after the other officers had detained appellant. He spoke with appellant and Neiman and looked at appellant's cell phone, where he observed a text message that referred, in his opinion, to narcotics sales. The prosecutor asked Deputy Adams where he found the phone, and Deputy Adams responded: "You know, I don't recall. I don't recall where it came from. I don't know if Deputy Ayala had retrieved it from him. I don't remember even where it was at the time. I just know I looked at the phone." Deputy Ayala was never asked, either on examination or cross-examination, if he found the cell phone or where he found it. It appears that Deputy Adams had "known about [appellant] for a year or two."

Deputy Adams went on to testify as to the contents of the text message he observed and an exchange of more messages he initiated with the sender. The initial text he noted was from an "M Espy" (Espy) and said: "Damn it, just got your text. Got some junk earlier. Got 20 if you want it. Text me." Deputy Adams sent a text message to Espy pretending he was appellant and inquiring further of Espy. Espy responded: "Hey, does it work? Last stuff was bunk. Need a 50. If it's bomb, can you do it?" Deputy Adams then wrote: "Sure. No problem. Give me a couple of hours. And it's the bomb." Espy replied: "Hours. I'll get a car and go to you." After Deputy Adams's last text message, a person arrived at appellant's home who said he was there on Espy's behalf to pick up methamphetamine. Deputy Adams spoke with this man, checked him for warrants, and then sent him away.

Deputy Adams used this and other information he had collected to request a search warrant. One of appellant's neighbors called the deputy repeatedly in the last

3

year or two to report a good amount of traffic at appellant's house. He also had a confidential informant who told him appellant was selling narcotics. A third person, another neighbor, called the sheriff's station when he or she observed the officers detaining appellant. This person reported being "glad" the officers had arrested appellant and reported finding "meth bags" many times in appellant's yard.

Deputy Adams's affidavit in support of the search warrant recounted how the other officers had conducted a traffic stop of appellant and observed him reaching toward the floorboard, where Deputy Ayala later found the vial containing the hydrocodone pill. The affidavit also recounted Deputy Adams's text messages with Espy on appellant's phone, and how an individual later arrived at appellant's home to pick up methamphetamine on behalf of "Michael Espinoza." Deputy Adams additionally set forth the following: (1) While at appellant's home on August 9, 2011, a neighbor observed the officers detaining appellant and called the local station to say he was "glad" they were detaining appellant because he had recently seen a large amount of foot and vehicle traffic, and he had found empty methamphetamine bags on and around the property; (2) a confidential informant told Deputy Adams in March 2011 that he had observed appellant selling methamphetamine from appellant's home on numerous occasions, and the informant told the deputy again in June 2011 that appellant continued to sell methamphetamine; (3) appellant had a surveillance camera on the front of his home facing the driveway and front porch area, and in Deputy Adams's experience, such cameras were commonly used to warn the resident when law enforcement or potential narcotics buyers were present; and (4) appellant's passenger in his car, Neiman, was a recently discharged parolee whose controlling parole case was for possession of methamphetamine.

The court ruled tentatively that there was probable cause to stop appellant, and the officers were authorized to arrest appellant for a traffic violation, but there was no probable cause to conduct a search of the car or the vial found on the floorboard. In noting these tentative thoughts, the court opined that if the officers were entitled to

4

arrest appellant, under *People v. Diaz* (2011) 51 Cal.4th 84, 93 (*Diaz*), they were entitled to search the contents of appellant's cell phone incident to that arrest. Defense counsel requested and was given permission to present additional witnesses (appellant and Neiman) relating to the traffic stop and whether there was probable cause. Defense counsel's argument then focused on whether there was probable cause to stop appellant. The prosecutor argued, among other things, that the stop and arrest were lawful, and the phone could be searched as "property immediately associated with the person of the arrestee" under *Diaz*.

The court granted the motion to suppress as to the vial and the hydrocodone pill only and denied the motion to quash the warrant. It ruled there was no probable cause to search the vehicle at the time the deputies searched and found the vial. Still, it found the traffic stop was proper and appellant's detention and arrest for a traffic violation was proper, as was the search of the cell phone. Further, looking at the four corners of the search warrant affidavit, the court ruled Deputy Adams's affidavit set forth probable cause for the warrant, even without the vial of hydrocodone.

The People filed an information charging appellant with one count of possession for sale of a controlled substance. Appellant filed a motion to set aside the information pursuant to Penal Code section 995, arguing in part that the deputies could not search his cell phone incident to an arrest for a traffic violation because the phone could not possibly contain any evidence relating to such an offense. The court denied the motion. Appellant filed a second motion to set aside the information. The court again denied the motion.

## 2. Evidence at Trial

On August 9, 2011, Sergeant Morgan and Deputy Ayala conducted a traffic stop of appellant in front of his house. Appellant was subsequently arrested. Deputy Ayala searched appellant at the scene and found a cell phone in one of the front pockets of appellant's pants.

5

Deputy Adams responded to the location where appellant was detained. He looked at appellant's cell phone and found text messages on it. As he did at the preliminary hearing, Deputy Adams testified about the initial text message from Espy and the exchange of messages with Espy in which he pretended he was appellant. Deputy Adams said he observed a surveillance camera mounted on the front porch of appellant's house and pointing towards the front porch and driveway.

Sergeant Morgan executed the search of appellant's house along with others, and in a bedroom of the house she located (1) three glass pipes coated with a methamphetamine residue, (2) numerous small blue Ziploc baggies, (3) a small digital scale in good working order, (4) three empty vials labeled as hydrocodone, (5) a clear bag filled with a white crystal-like substance, and inside the bag, another bag filled with a white crystal-like substance, and (6) a plastic Pepsi container with a hidden compartment inside. The white crystal-like substance in one of the bags was later determined to be 1.01 grams of methamphetamine. She also found several bills scattered throughout the bedroom with appellant's name on them, indicating the bedroom was appellant's. Deputy Paul Han also executed the search of appellant's house. Deputy Han searched the closet in appellant's room and recovered a Ziploc baggy from a shirt pocket containing suspected methamphetamine.

Deputy Adams interviewed appellant after he had been arrested and his house had been searched. Appellant said the bedroom in which deputies recovered the above items belonged to him. He also said the items found in the bedroom belonged to him, including the bag of methamphetamine, a bag of cutting agent, several Ziploc baggies, some pills, and a scale. Appellant said he had been selling methamphetamine on and off for several years and as recently as the last few days. He also indicated he used methamphetamine.

Deputy David Mertens is a narcotics detective who the prosecution presented as an expert in possession of narcotics for sale. He opined appellant possessed the methamphetamine for purposes of sale. Deputy Mertens based his opinion on (1) the

6

methamphetamine found during the search of appellant's bedroom, which amounted to approximately 50 useable quantities of methamphetamine; (2) appellant's admission to selling methamphetamine for the last few years, including during the last few days; (3) the text messages between Deputy Adams and Espy on appellant's phone, which he believed suggested appellant was selling at least to Espy; (4) the surveillance camera watching the front door of appellant's house, a type of early warning system that would alert him of law enforcement approaching or of "rival people" who may try to "rip [him] off"; (5) the numerous empty and unused baggies found during the search; (6) the scale to weigh drugs found during the search; and (7) the cutting agent used to mix with the drug and increase the volume of it.

Appellant testified in his own defense. When Deputy Ayala approached appellant's car during the traffic stop, appellant had his cell phone in his hand. Deputy Ayala told appellant to put down the phone; appellant then threw the phone to the back seat of the car. Deputy Ayala pulled appellant out of his car, handcuffed him, and put him in the back of the patrol car. Appellant told Deputy Adams the methamphetamine found in appellant's bedroom was his. He never told Deputy Adams he possessed the methamphetamine for sale or that he had been selling it on and off for years. He was not selling the methamphetamine. The 1.01 grams of methamphetamine was for his own use. He told the deputy he had been a user on and off for about 16 years. He could use upwards of a gram of methamphetamine per day. He used the small baggies Sergeant Morgan found to take small amounts of methamphetamine out with him. He used the scale Sergeant Morgan found to weigh methamphetamine after he purchased it to ensure he had not been cheated. He used the surveillance camera as an antitheft measure. His car was stolen several years ago, and it had not been recovered. He wanted to prevent that from happening again. The bag of cutting agent was not his. An acquaintance brought it over a few months ago and he did not realize the acquaintance had left it behind. He did not recall receiving a text from Espy the night before his arrest. He never offered to sell or provide any drugs to Espy. He thought

7

Espy's text message was meant for someone else because he had not heard from Espy for approximately a month prior to his arrest.

## STANDARD OF REVIEW

In reviewing the trial court's ruling on a motion to suppress, we accept the court's express and implied factual findings so long as they are supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673.) We exercise our independent judgment to determine whether, based on those facts, the motion to suppress should have been granted or denied. (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

## DISCUSSION

### 1. *Appellant's Fruit of the Poisonous Tree Argument Lacks Merit*

Appellant contends we must reverse his conviction because the search of his home was the fruit of an illegal search of his cell phone. He relies principally on *Diaz, supra*, 51 Cal.4th at page 93, in which the court held a cell phone "immediately associated with [the] defendant's person" -- that is, on the defendant's person at the time of his lawful arrest -- was properly subject to a warrantless search. Appellant asserts the court erred because the prosecution did not show the deputies recovered the phone from appellant's person at the preliminary hearing. He concedes, on the other hand, that if the officers recovered the cell phone from his person at the time of arrest, they could lawfully search the phone. We find no cause for reversal. Appellant has forfeited his argument, and even if he had not, an independent source of probable cause supported the search warrant for his home.

### a. *Forfeiture*

Respondent contends appellant forfeited his challenge to the search of the phone by failing to identify that search as a basis for his suppression motion and failing to point out the gap in the prosecution's legal analysis regarding the lawfulness of the search. Respondent relies on *People v. Williams* (1999) 20 Cal.4th 119, 136 (*Williams*), in which our Supreme Court held: "[W]hen defendants move to suppress

8

evidence, they must set forth the factual and legal bases for the motion, but they satisfy that obligation, at least in the first instance, by making a prima facie showing that the police acted without a warrant.  The prosecution then has the burden of proving some justification for the warrantless search or seizure, after which, defendants can respond by pointing out any inadequacies in that justification.  [Citation.]  Defendants who do not give the prosecution sufficient notice of these inadequacies cannot raise the issue on appeal."

We agree appellant forfeited his challenge under *Williams*.  Appellant's motion sought to suppress "all evidence seized by law enforcement during his arrest on August 9, 2011," which included the cell phone and the text messages.  He also asserted the stop and search were conducted without a warrant and were unreasonable because probable cause was lacking.  While this was sufficient to put the prosecution to its burden of proving the warrantless search of the phone was justified, it did not necessarily alert the court or the prosecution that the warrantless search was unreasonable *because of the location of the phone.*  (*Williams, supra*, 20 Cal.4th at p. 130 ["Of course, if defendants have a specific argument *other than the lack of a warrant* as to why a warrantless search or seizure was unreasonable, they must specify that argument as part of their motion to suppress and give the prosecution an opportunity to offer evidence on the point."].)  If appellant had so alerted the prosecution, it stands to reason the prosecutor would have elicited testimony from Deputy Ayala regarding where he found the phone, as the prosecutor did at trial.

The prosecutor attempted to justify the search and seizure of the phone by arguing it was incident to appellant's lawful arrest under *Diaz.*  Appellant challenged his arrest as unlawful, but he never raised the separate issue of the location of the phone.  Even if the stop and arrest were lawful, the location of the phone might change the analysis under *Diaz*, as appellant now recognizes.  It was up to appellant to point out this inadequacy in the prosecution's justification.  (*People v. Williams, supra*, 20 Cal.4th at p. 130 ["Moreover, once the prosecution has offered a justification for a

warrantless search or seizure, defendants must present any arguments as to why that justification is inadequate."].)  If he detected "a critical gap in the prosecution's proof or a flaw in its legal analysis," he had to object on that basis "or risk forfeiting the issue on appeal."  (*Ibid.*)  "Defendants cannot . . . lay a trap for the prosecution by remaining completely silent until the appeal about issues the prosecution may have overlooked."  (*Id.* at p. 131.)  After the preliminary hearing and the motion to suppress, appellant filed a motion to set aside the information.  Even then, he did not argue the cell phone search was unlawful because there was no evidence the phone was on his person.  Had he done so, the prosecution might have requested the opportunity to submit evidence on the issue.  By failing to raise the issue until now, appellant has forfeited the issue.

*b.  Independent Source Doctrine*

Assuming appellant had not forfeited his argument, and assuming further the search of the phone was unlawful, we would nevertheless reject his challenge because there was an independent source of probable cause to support the search warrant.

"It has long been established that even if a criminal investigation involved some illegal conduct, courts will admit evidence derived from an 'independent source.'" (*People v. Weiss* (1999) 20 Cal.4th 1073, 1077.)  "'The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation . . . .  [It] teaches us that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred.  [Citations.]  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.'"  (*Id.* at pp. 1077-1078, quoting *Nix v. Williams* (1984) 467 U.S. 431, 443, original italics, fn. omitted.)

10

When an affidavit supporting a search warrant contains information obtained through unlawful conduct as well as untainted information, the independent source doctrine involves a two-prong test. (*People v. Robinson* (2012) 208 Cal.App.4th 232, 241.) "First, the affidavit, excised of any illegally obtained information, must be sufficient to establish probable cause. [Citation.] Second, the evidence must support a finding that 'the police subjectively would have sought the warrant even without the illegal conduct.'" (*Ibid.*, italics omitted.)

We determine de novo whether the search warrant affidavit is sufficient to establish probable cause absent the challenged information. (*People v. Robinson, supra*, 208 Cal.App.4th at p. 241.) "Probable cause sufficient for issuance of a warrant requires a showing that makes it '"substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought."'" (*People v. Carrington* (2009) 47 Cal.4th 145, 161.) "'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (*People v. Kraft* (2000) 23 Cal.4th 978, 1040-1041, quoting *Illinois v. Gates* (1983) 462 U.S. 213, 238.)

Here, if we were to excise from the affidavit the information about the text messages and the individual who appeared on behalf of Espy, the magistrate still had probable cause for issuing the search warrant. A confidential informant told Deputy Adams in March 2011 that appellant was selling methamphetamine from his home, and the informant told him in June 2011 that appellant continued such activity. Because this was two months before the August 9 stop and arrest of appellant, appellant argues the information was too stale and could not be used to issue a warrant. But "[n]o bright-line rule defines the point at which information is considered stale." (*People v. Carrington, supra*, 47 Cal.4th at p. 163 [information two months old not too

11

stale to provide probable cause for search warrant].) The passage of time does not necessarily render information stale. (*Id.* at p. 164.) "Courts have upheld warrants despite delays between evidence of criminal activity and the issuance of a warrant, when there is reason to believe that criminal activity is ongoing or that evidence of criminality remains on the premises." (*Ibid.*) The question of staleness is a fact-specific inquiry and the answer will vary depending on the circumstances of each case. (*Id.* at p. 163.) The information from the informant, who had not only observed sales at appellant's home but had transported, purchased, and distributed narcotics for appellant, suggested appellant had been selling methamphetamine at his house from at least March through June. It was not unreasonable to believe the sales operation continued to be ongoing for another two months, especially because this was not the only information in the affidavit. Appellant's neighbor, who observed the deputies detaining appellant in front of his home, contacted the sheriff's department and reported a great deal of foot and vehicle traffic at the house recently, and he reportedly also found empty baggies of the type used for storing methamphetamine on and around the property. (See *People v. Mikesell* (1996) 46 Cal.App.4th 1711, 1718 [information from confidential informant that was several years old was not valueless when, in combination with more recent information, it painted a picture of defendants' continuing participation in drug trade].) As well, appellant had a surveillance camera monitoring his front porch and driveway, a common early warning device used by narcotics dealers in Deputy Adams's experience. Given these circumstances alone, the magistrate had probable cause for concluding there was a fair probability a search of appellant's home would uncover narcotics activity.

Moreover, the evidence supports a finding Deputy Adams subjectively would have sought the warrant even absent the cell phone evidence. Deputy Adams had known of appellant for awhile because of information from a confidential informant and a neighbor. Appellant does not challenge the stop and arrest on appeal. The traffic stop was what moved the investigation along that day. The stop led to the cell

12

phone, to be sure, but it also led to the contemporaneous call from the second neighbor-cum-informant and the information that appellant's companion was on parole for possession of methamphetamine. The evidence suggests Deputy Adams would have moved for a search warrant no matter the cell phone.

*c. No Prejudice at Trial*

Finally, because the evidence collected at appellant's home was not inadmissible fruit of the poisonous tree, any error in failing to suppress just the cell phone evidence would have been harmless beyond a reasonable doubt at trial. (*People v. Moore* (2011) 51 Cal.4th 1104, 1128-1129 [assuming error, applying "harmless beyond a reasonable doubt" standard to failure to suppress evidence, and finding no prejudice].) The evidence supporting the judgment was substantial without the text messages. The deputies found 50 usable quantities of methamphetamine in appellant's bedroom along with items used to package methamphetamine for sale -- a scale, empty Ziploc baggies, and cutting agent. Deputy Mertens, the prosecution's expert on possession for sale, explained the scale, the empty baggies, and cutting agent were all things a narcotics dealer would normally possess and use. In addition, he noted a surveillance camera like the one appellant had was a common early warning system used by dealers. Further, far more damaging than the text messages, appellant admitted to Deputy Adams he had been selling methamphetamine for years and had done so recently. Given all the evidence, any error in admitting the text messages at trial was not prejudicial.

**2. Appellant's Confrontation Clause Argument Lacks Merit**

Appellant argues admission of the text messages violated his Sixth Amendment right to confront the witnesses against him. Inasmuch as he did not object to the evidence on this ground in the trial court, he has forfeited the issue. Had he not forfeited the issue, we would still reject this argument.

The confrontation clause has no application when, as here, the out-of-court statements at issue are nontestimonial. The confrontation clause is violated only by

13

the admission of testimonial hearsay statements.  (*People v. Loy* (2011) 52 Cal.4th 46, 66; *People v. Arceo* (2011) 195 Cal.App.4th 556, 571.)  Statements considered testimonial are generally those """"made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . ." [citation].'"  (*People v. Dungo* (2012) 55 Cal.4th 608, 616.)  When it cannot reasonably be anticipated that a statement will be used at trial, the statement is not "testimonial" within the meaning of the confrontation clause.  (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 174.)  When Espy was exchanging text messages with the deputy who was impersonating appellant, Espy could not have known he was communicating with law enforcement.  The tone of Espy's messages is informal and casual.  Undoubtedly he assumed he was communicating with his friend or acquaintance.  Casual remarks to an acquaintance are not testimonial.  (*People v. Loy, supra*, at pp. 66-67.)  Additionally, even if the text messages violated the confrontation clause, any error in admitting them was harmless beyond a reasonable doubt, as discussed above.  Their erroneous admission would not require reversal.

**DISPOSITION**

The judgment is affirmed.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.



GRIMES, J.


14